

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. WR-79,286-01

---

### EX PARTE FRANK NAVARIJO

---

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 98-CR-4635 IN THE 186TH DISTRICT COURT
### FROM BEXAR COUNTY

---

ALCALA, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, KEASLER, HERVEY, and COCHRAN, JJ., joined. PRICE, J., filed a concurring opinion. WOMACK and JOHNSON, JJ., dissented.

### O P I N I O N

To establish that he is actually innocent of an offense of which he has previously been convicted, an individual seeking post-conviction relief on that basis must demonstrate by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Although Frank Navarijo, applicant, has provided some new evidence in support of his claim that he is actually innocent of the offense of aggravated sexual assault of a child, we conclude that he has failed to meet this standard because his new exculpatory evidence, which comes in the form of a recantation from the complainant some thirteen years

after his conviction, does not unquestionably establish his innocence when that evidence is considered in light of other incriminating evidence in the record. Furthermore, although the habeas court in this case determined that the complainant's recantation testimony was more credible than her trial testimony and recommended granting relief on that basis, we disagree with the habeas court's assessment that the matter of a recanting witness's credibility is the sole deciding factor in an actual-innocence case, and we further disagree with its related determination that applicant has unquestionably established his innocence under *Ex parte Elizondo*, 947 S.W.2d 202, 206, 209 (Tex. Crim. App. 1996). We exercise our authority to reach the contrary conclusion, and, accordingly, deny relief. *See Ex parte Reed*, 271 S.W.3d 698, 727-28 (Tex. Crim. App. 2008).

## I. Background

### A. Trial Proceedings

In 1999, applicant was convicted of aggravated sexual assault of a child and sentenced to twenty years' imprisonment. The complainant in the case was applicant's daughter, who was five years old at the time of the outcry and seven years old at the time of applicant's jury trial. At trial, the State presented evidence consisting of testimony from the complainant, in which she stated that applicant had "hurt" her and gone "inside" her "private area," and testimony from a medical expert stating that the complainant's genitals showed signs of penetration. The defense presented evidence that included a videotape of a prior recantation by the complainant to CPS several days after the initial outcry, in which she stated that she

"had told a lie" about the allegations because of pressure from her grandmother. The defense

additionally presented the testimony of thirteen witnesses, including the complainant's

mother and grandmother; applicant's medical doctor, who stated that applicant had been

diagnosed with prostate cancer and was likely impotent at the time of the offense; and several

of applicant's family members. The following is a summary of the relevant trial testimony:

- **Complainant's testimony**: The complainant testified that her father, applicant, "hurt" her "a lot of times," "too many" times to count, and this occurred when she was in her bedroom at their house. Applicant would take off her pajamas and "touch" her "private parts." When asked how it felt when applicant "hurt" her, the complainant said it felt "bad," "like if I fell down and hurt myself," "like a cut," or "like if I was bleeding and it would sting." She stated that applicant touched her with his hands and with a "pico," which she described as "a little sharp knife," but she also said that she had never seen the "pico." She stated that applicant would go "a little bit in the inside" of her private parts. She first told her grandmother what happened and later she told "a lot of people," including social workers and counselors. When asked if her grandmother or her mother had told her to lie about the allegations, she denied that and said that her grandmother and mother "always said tell the truth."

  On cross-examination, the complainant said she used to stay overnight at her grandmother's house "a lot" and had been living with her ever since the outcry. She agreed that her grandmother had never liked applicant and did not spend time with him. She did not remember the day when she first told her grandmother that the abuse had occurred. She recalled that the abuse happened "a lot of times" and that it would occur at night after her mother went to sleep and applicant stayed awake watching television. She stated that her mother had seen the abuse happening before. When questioned about a prior recantation that occurred several days after the initial outcry, she said she did not remember having recanted the allegations to an interviewer with the Children's Advocacy Center, to whom she had indicated that her grandmother had told her to lie and that the abuse never happened.

- **Expert testimony of Dr. Nancy Kellogg:** Dr. Kellogg, a medical doctor and medical director of the Alamo Children's Advocacy Center, testified that she had examined the complainant's genitals around three days after the initial outcry and detected signs of repeated penetration. She stated that the complainant had "very little hymen" and that the hymen was "worn away" to the point where the vagina had become "fully

visible," all of which was "highly consistent" with "repeated acts of penile vaginal penetration. To be more specific, blunt penetrating trauma on a hard basis, to the point where most of the hymen is gone." She stated that both the floor and bottom of the complainant's vagina were visible. She explained that it was "very unusual" to see that much vaginal tissue in a child of the complainant's age, and that sexual abuse was "highly probable." She further stated that contact with a young child's hymen is "sensitive" in terms of being "painful to touch," and she agreed that young children often describe a rubbing force against the hymen as causing a "sharp pain." She presented photographs to the jury comparing a "normal" hymen and the complainant's hymen, which demonstrated that the complainant had "a lot less" hymen than a "normal" five-year-old would have. She concluded that the results of the examination were "abnormal" and stated that this degree of erosion of the hymen was present in "fewer than ten percent" of the cases she had seen. She explained that "there are different shapes of hymens" and that the attenuation of a hymen is a "form of a scar" demonstrating evidence of "trauma." She opined that her findings were "definitive" that sexual abuse had occurred and stated that, on a scale of one to ten, "if the highest concern is ten, I felt she [the complainant] was [a] ten. I was very, extremely concerned."

• **Testimony of Paula Garza, complainant's grandmother:** Garza was called to testify by the defense. She identified applicant as her son-in-law, who was at that time married to her daughter, Delia. She said she had "raised" the complainant in her home "because her mother was working," and the complainant and her mother would "come and go" from applicant's home. She reported that the complainant first made an outcry to her in January 1998. She stated that, prior to that time, she had "noticed that the child was sad. That she would come in from school and she would just lie on the bed . . . and she would—she would be aggressive. She would say, 'Leave me alone.'" Garza stated that she sat the complainant on her lap and asked her to tell her what had happened so that she could "help" her. The complainant told Garza that applicant "would put the pico in her private parts," and Garza then "realized that it was no such pico, that it was the man's penis." The complainant also told Garza that "when [the complainant] was crying on the bed, her mother would go to the door and would turn around and would not do anything for her." The complainant also told Garza that applicant put the "pico" in her rectum.

When asked whether she was motivated to testify because of her dislike of applicant and her pursuit in civil court of custody of the complainant, Garza denied that and answered, "I am only interested in . . . defend[ing] the child." She acknowledged that she had never noticed any injuries on the complainant and that the complainant never complained of any pain or injury. The complainant told Garza that

she would not cry during the incidents of abuse because applicant would tell her to shut up.  The complainant also told Garza that applicant had said the complainant's vagina "belonged to him."

• **Testimony of Dr. Paul Navar:**  Dr. Navar, director of the emergency department at Sierra Medical Center in El Paso, provided expert testimony to rebut the testimony of Dr. Kellogg.  He stated that some children can sustain "straddle injuries," such as bleeding or a laceration to the genital area, as a result of a playground fall or other circumstances not involving sexual abuse.  He explained that "the appearance of the female genitalia and the appearance of the hymen, in particular, are just quite varied.  If you take several hundred children . . . you will see a number of different sizes and shapes of the differing female anatomy."  He described a finding of an attenuated hymen as being a "nonspecific finding," which he described as "something that happens in cases of sexual abuse, but it's also something that happens in normal children." After reviewing the slides of the complainant's genital area, Dr. Navar concluded that the "hymenal rim" was "a little bit thinner, what we call attenuated, than most hymenal rims that you see.  But that is not the definitive finding of sexual assault, in that a thinning of the hymenal rim like this will occur in a small percentage of normal children."  He opined "that the findings in this case neither confirm nor deny sexual abuse," but also cautioned that he had not been able to examine the complainant personally and was limited to the information contained in the slides.

On cross-examination, Dr. Navar agreed with Dr. Kellogg's observation that it was possible to see into the complainant's vagina and that this view would likely be obscured by the hymen in a normal child.  He conceded that a thin hymen is present in many children who have been sexually abused.  He acknowledged that the condition of the complainant's hymen was present in more abused children than in non-abused children, and he also acknowledged that a "straddle injury" cannot cause thinning of the hymen.  He observed that in a study comparing three groups of children, the particular width of the complainant's hymen was present in around five percent of "normal," non-abused children.

• **Testimony of Amanda Way, CPS investigator**: Amanda Way was the investigator who initiated contact with the complainant following the outcry.  Way visited the complainant at her school on a Friday in 1998.  Way spoke separately with the complainant, her mother, and grandmother, all of whom were present at the school.  The complainant told Way at that time that applicant had hurt her in her private area.  Way set up a follow-up interview with the complainant at the Alamo Children's Advocacy Center for the following Monday.  The jury viewed the videotape of that interview, during which the complainant told Way that her "grandma told a lie . . .

about my dad." In the video, she stated that she had lied "about my dad always touching me right here [pointing to the genitals]. But he didn't." She stated that her grandmother had "told me to say it," but "it was a lie." Way testified that she did not believe the complainant's recantation because the complainant had been staying with her mother over the weekend, and it was Way's belief, based on the demeanor of the complainant during the interview, that the mother had pressured the complainant into recanting. She stated that during the videotaped interview, the complainant was "very quiet" and "nonresponsive." She stated that the complainant's mother was "resistant" and "upset" at the time of the follow-up interview, and that the complainant had indicated that it was her mother who told her that "grandma told a lie."

In addition to the testimony described above, applicant took the stand in his own defense. He stated that Garza had always "hated" him and had told the complainant that he was a "dirty old man." He suggested that Garza was responsible for fabricating the allegations against him. Applicant further stated that he was diagnosed with prostate cancer in 1997 and that, after having surgery to remove his prostate, he became impotent. His medical doctor testified and corroborated applicant's statement that he had had his prostate removed, but he did not conclusively state that this had resulted in impotence in applicant.

After hearing nearly two weeks of testimony, the jury found applicant guilty and sentenced him to 20 years' imprisonment. Applicant's conviction was affirmed on direct appeal. *See Navarijo v. State*, No. 04-99-00833-CR, 2001 WL 487959 (Tex. App.—San Antonio May 9, 2001, pet. ref'd).

**B. Habeas Proceedings**

In July 2012, applicant filed the present application for a post-conviction writ of habeas corpus, in which he alleges that he has newly available evidence of his innocence in the form of a 2011 recantation from the complainant, who was by that time nineteen years

old. In support of his application, applicant filed affidavits from the complainant, his then ex-wife Delia, and psychologist Dr. Joann Murphey, as well as several affidavits from jurors stating that they would not have convicted him in light of the new evidence. Applicant contends that the complainant's testimony was the "crucial evidence" against him at his jury trial and that the new evidence of her recantation conclusively establishes his innocence. In November 2012, the habeas court conducted a live hearing to receive testimony on applicant's actual-innocence claim. At the hearing, the court heard testimony from the complainant and Dr. Murphey, both of whom testified consistently with their affidavits.

The complainant testified that she is now living on her own, attending school, and working. She told the court that she had not been pressured into recanting her trial testimony and that her trial testimony was false. She explained that she had been influenced by her grandmother, who "did not like men" and "hated" applicant. She stated that her grandmother "essentially told [her] to tell these lies," and indicated that she was afraid her grandmother would "discipline" her if she did not lie. When asked by applicant's counsel why she had waited so long to come forward, the complainant stated that she "just wanted to set the record straight." On cross-examination by the State, the complainant confirmed that she went to live with her grandmother after the trial and lived with her until she was ten or eleven years old, when she went to live with her mother. The State asked the complainant how much she remembered from the relevant time period in the following exchange:

Q: I want to know how much you actually remember from back at that time.
Do you remember the Thursday when you told your grandmother, according

to the testimony at trial, that your father had touched you? Do you recall that day?

A: No, I do not remember. I do not recall.

Q: Do you recall going to school the next day with your grandmother and then her telling a school official and that's when counselors and CPS became involved? Do you recall any of that?

A: No, I do not recall that.

Q: Do you recall going home with your mother for the weekend, right after this happened, before the investigation started to take place? Do you recall that?

A: No.

Q: Do you recall going to talk to CPS on Monday morning?

A: I remember going to talk to CPS, but I'm not sure if it's that instance.

. . .

Q: Do you remember when you talked to CPS and you—they video recorded it and that you wouldn't talk to CPS, that that was the time that you recanted immediately after the weekend with your mother; do you recall that?

A: No, I do not recall.

Q: In fact, at trial, do you recall being questioned about that video?

A: Yes, I recall being in trial.

Q: Do you remember what your responses were at trial?

A: No.

. . .

Q: When your grandmother started this in your head, do you remember when that was?

A: No, I don't—I don't remember.

Q: So you remember or you're testifying that you were not telling the truth and that—but you don't remember her actually telling you that or—

A: I don't remember when it started, but it continued throughout me growing up.

. . .

Q: So really, looking back, there's not a whole lot that you remember about that incident; is that correct?

A: Yeah, that's correct.

. . .

Q: Do you recall there's some [testimony] that you actually had a discussion about being sexually assaulted with your aunt even when you were three? Do you have any memory of that?

A: No, I don't.

Q: So it would be fair to say that when you were five you probably had no memory of that either?

A: Yeah, I believe I have no memory of that.

On re-direct examination, applicant's attorney asked the complainant if she "remembered telling CPS that it didn't happen and then you ended up telling CPS that it did happen with [applicant], right?" The complainant answered, "Yes."

In accordance with her 2012 affidavit, Dr. Murphey testified at the habeas hearing that she had "a very in-depth" conversation with the complainant and that nothing the complainant said gave her any concern about the existence of outside pressures to recant. She further stated that the complainant had described herself as being "easily led" and agreed that a person who is easily led could be influenced into recanting. She concluded that the complainant's recantation is credible. Regarding how much of the surrounding events the complainant remembers, Dr. Murphey stated that the complainant "does not remember much about her father" and has "no recollection of interactions with CPS interviewers," but that she does "recall[] clear memories of her grandmother coaching her to lie about her father."[1]

After the hearing, the habeas court adopted applicant's proposed findings of fact and conclusions of law. In those findings, it found the complainant's recantation credible and recommended that relief be granted, stating that it was applying this Court's opinion in *Ex*

---

[1] Although she did not testify at the habeas hearing, applicant's ex-wife, Delia Rodriguez, provided a written affidavit in which she averred that she was "told by [the complainant, her daughter] that these allegations are untrue" as early as 2002. Rodriguez recalled that her daughter stated that applicant "did not abuse her or hurt her" and that she "felt better" after telling the truth. Rodriguez stated that the complainant had indicated that her grandmother told her to "make up" the allegations against applicant. She further stated that her mother, Garza, "never liked" applicant and would call him a "dirty old man and other derogatory names."

*parte Elizondo*, 947 S.W.2d at 209. The habeas court's relevant fact findings state as

follows:

- In finding number two, the court states that it "observed the demeanor of [the complainant] at the hearing and found [her] to be credible and believable in her testimony." It found that the complainant "is now a mature 20-year-old adult (she was five years old at the time of the outcry) and has been at college or in an apartment on her own since the Fall of 2010."

- In finding number four, the court found that "over time when [the complainant] was very young, her grandmother kept telling [her] that her dad touched [her] improperly. Her grandmother eventually told [her] to tell the authorities that [her] dad had touched [her] in her privates."

- In finding number five, the trial court found that the complainant "testified at the writ hearing that these allegations were false and this Court finds that [she] was credible and believable as a witness at the writ hearing regarding these allegations."

- In finding number seven, the court found that Dr. Murphey was "credible and believable" and that Dr. Murphey is convinced that the complainant's recantation is credible.

- The court ultimately found that the complainant's "recantation in this case is more credible than was her trial testimony."

On the basis of these findings of fact, the habeas court concluded that the

complainant's "recantation is not implausible on its face" and that

> another jury hearing the evidence, including the newly discovered mature recantation of [the complainant's] juvenile testimony, would view the new evidence as the more credible and would acquit the applicant. This is especially true since [the complainant, in 1998] recanted her preliminary allegation against the applicant and claimed that her grandmother forced her to make the false claim against the applicant.

The habeas court further concluded that the complainant's "recantation not only voids her

trial testimony which implicated the applicant, but constitutes affirmative evidence of

applicant's innocence. . . . This court is convinced by clear and convincing evidence that no rational jury would convict the applicant in light of the new evidence[.]"

The judge at the habeas hearing was not the same judge who presided over applicant's trial in 1999. The habeas court did not receive any testimony from the complainant's grandmother or any new medical evidence. Although the trial record would have been available, it is unclear whether the habeas court actually reviewed the trial record in this case because its findings and conclusions do not address, in any detail, the evidence adduced at trial or the probable impact of the newly discovered evidence upon the State's case as a whole.

## II. Applicant Has Failed to Demonstrate That He Is Actually Innocent

Although applicant has presented some new evidence of his innocence in the form of a recantation from the complainant, we are not convinced that this evidence unquestionably establishes his innocence when it is viewed in the broader context of the entire record, including the evidence of applicant's guilt adduced at trial. After conducting the required weighing of the new exculpatory evidence against the evidence of guilt adduced at trial, we conclude that applicant has failed to establish by clear and convincing evidence that he is actually innocent, that is, that no reasonable juror would have convicted him in light of the new evidence. *See Elizondo*, 947 S.W.2d at 209.

## A. Applicable Law for Actual-Innocence Claims

In *Ex parte Elizondo*, this Court held that a convicted individual is entitled to post-

conviction relief on the basis of a due process violation if he can establish by "clear and convincing evidence" that "no reasonable juror would have convicted him in light of the new evidence." *See id.* at 209; *see also Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006) (stating standard for reviewing actual-innocence claims as being proof by "clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence") (quoting *Ex parte Tuley*, 109 S.W.3d 388, 392 (Tex. Crim. App. 2002)); *Ex parte Thompson,* 153 S.W.3d 416, 417 (Tex. Crim. App. 2005); *Ex parte Harmon*, 116 S.W.3d 778, 779 (Tex. Crim. App. 2002).[2] In *Elizondo*, we further described a reviewing court's inquiry as "decid[ing] whether the newly discovered evidence would have convinced the jury of applicant's innocence." *Elizondo*, 947 S.W.2d at 207. To determine whether an applicant has met this standard, the habeas court must "examine the new evidence in light of the evidence presented at trial." *Thompson*, 153 S.W.3d at 417. In *Elizondo*, this Court further explained:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was

---

[2]     There are two types of actual-innocence claims that may be raised on an application for a post-conviction writ of habeas corpus. A freestanding innocence claim, also known as a *Herrera*-type claim, involves a substantive claim in which an applicant asserts his bare claim of innocence based solely on newly discovered evidence. *See Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002); *Ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996). The second type of claim, a *Schlup*-type claim, is a "procedural claim in which applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial." *Franklin*, 72 S.W.3d at 675. A claim that a witness's recantation unquestionably establishes innocence is properly understood as a freestanding claim of innocence, or a *Herrera*-type claim. *See id.*

convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial.

*Elizondo*, 947 S.W.2d at 206; *see also Ex parte Franklin*, 72 S.W.3d 671, 677-78 (Tex. Crim. App. 2002) (same). Relief is not warranted without an applicant having made an "exceedingly persuasive case that he is actually innocent." *Elizondo*, 947 S.W.2d at 206; *see also id.* at 209 (stating that, in case of freestanding claim of innocence, the habeas court "must be convinced" that the new facts "unquestionably establish" the applicant's innocence; "unquestionably establish" means same thing as by "clear and convincing" evidence).

On post-conviction review of an application for a writ of habeas corpus, the convicting court is the original fact-finder, and this Court is the ultimate fact-finder. *See Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014) (citing *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012)). This Court ordinarily defers to the habeas court's fact findings, particularly those related to credibility and demeanor, when those findings are supported by the record. *Id*. We similarly afford deference to the habeas court's rulings on mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id*. (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). On the other hand, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Ex parte Flores*, 387 S.W.3d 626, 634-35 (Tex. Crim. App. 2012). We review de novo mixed questions of law

and fact that do not turn on an evaluation of credibility and demeanor. *See Weinstein*, 421 S.W.3d at 664 (citing *Guzman*, 955 S.W.2d at 89).

**B. Complainant's Recantation Fails to Establish that No Reasonable Juror Would Have Convicted Applicant in Light of Other Evidence**

Applying the actual-innocence standard described above to the facts of this case, we conclude that applicant has failed to meet that standard in light of (1) the lack of detail in the complainant's recantation testimony at the habeas hearing and the jury's rejection of evidence of the complainant's pre-trial recantation, and (2) the existence of inculpatory medical testimony that has not been otherwise explained by the complainant's recantation. We additionally explain that (3) even if we were to adopt the habeas court's assessment that the complainant's habeas testimony is more credible than her trial testimony, that fact finding, standing alone, would not compel granting relief under the applicable legal standard.

**1. Lack of Detail in Habeas Recantation Evidence And Jury's Prior Rejection of Pre-Trial Recantation Lessens Probable Impact Of New Evidence**

The habeas court based its assessment of the complainant's credibility on an evaluation of her "demeanor" at the habeas hearing, on the fact that she "is now a mature 20-year-old adult" as opposed to a child, and on the fact that she is now "at college . . . [and] in an apartment on her own" and no longer living with her mother or grandmother. The habeas court also found that certain circumstances indicated that the complainant's trial testimony may not have been truthful, including that the complainant's grandmother "manipulated and threatened her into making the statement against the Applicant," that she had recanted the

allegations against applicant on a prior occasion, and that "suggestive" questioning techniques may have "contaminated the investigation" in this case. On this basis, the habeas court found that the complainant was a "credible and believable" witness at the time of her recantation and that her recantation testimony was "more credible" than her trial testimony.

Given the lack of detail in the complainant's recantation testimony and her inability to recall basic facts surrounding the sexual-assault allegations against applicant, we conclude that her testimony fails to unquestionably establish applicant's innocence. *See Elizondo*, 947 S.W.2d at 206, 209. On the one hand, the complainant's trial testimony in this case was strikingly detailed given that she was seven years old at the time of trial. She stated where, when, and how applicant abused her. She said applicant would "hurt" her with a "pico" in her bedroom at the family home after her mother went to sleep at night. She recalled that applicant would pull down the bottoms of her "Tweety Bird" pajamas and that, when he touched her in her "private area," it felt like a knife cutting her. She indicated that she told her grandmother first, then a counselor at school, and then "a lot" of other people about the abuse. She said her mother and grandmother always told her to tell the truth about the allegations and that no one had told her to lie. Her testimony was corroborated by medical evidence showing a high probability that she had been sexually abused, as well as by the testimony of her grandmother and a CPS interviewer, both of whom described the complainant's statements and demeanor at the time of the events.

By contrast, in her recantation testimony at the habeas hearing, which came some

thirteen years after applicant's trial, the complainant generally denied that any abuse happened but otherwise exhibited a lack of memory or awareness of the circumstances surrounding the abuse allegations. In response to the State's questioning, the complainant stated that she "do[es] not recall" many important facts, including initially talking to her grandmother and CPS about the allegations. In this regard, we find that this case bears some similarities to *Ex parte Brown*, in which this Court held that the applicant had failed to satisfy the actual-innocence standard in *Elizondo*, in part, because the complainant's recantation testimony at the habeas hearing was "vague, uncertain, and nonspecific," with the complainant merely "claim[ing] a lack of memory" while "mak[ing] a global denial of sexual abuse." *Brown*, 205 S.W.3d at 547.[3] Under those circumstances, the Court held that the

---

[3] More recently, in *Ex parte Harleston*, this Court denied relief on an actual-innocence claim, in part, because the recanting witness's testimony at the live habeas hearing was "internally inconsistent and present[ed] implausible explanations" of why the complainant would have fabricated sexual-assault allegations against the applicant. *See Ex parte Harleston*, No. WR-79,196-01, ___S.W.3d___, 2014 WL 1923231, at *11 (Tex. Crim. App. May 14, 2014). The Court explained,

> Significant objective evidence from the habeas record supports a finding that . . . [the complainant] K.D.'s recantations and stories explaining why she recanted were internally inconsistent, implausible, and portions of them factually impossible. The stories that she told in various forms throughout the postconviction proceedings were also contradicted by the testimony adduced at Applicant's trial. For example, the genuineness of K.D.'s outcry was supported by a number of witnesses at trial, and those witnesses'[] testimony was, at best, only implicitly impeached by Applicant's presentation of K.D.'s several and inconsistent alleged recantations. . . .

*Id*. at *19. In *Harleston*, we went on to observe that the State's evidence at trial included "a number of witnesses who supported the circumstances of K.D.'s sexual-assault outcry as genuine, and some of those witnesses were experts in the area of child psychology and counseling and were trained to identify false sexual-assault outcries." *Id*. We concluded that, in light of the "sheer number of back

(continued...)

complainant's explanation of what had really happened, seven years after the event, was "dubious at best," and was not, therefore, sufficient to establish the applicant's innocence under *Elizondo*. *Id*. (observing that the habeas court's findings in that case had made "no explanation of whether or why this evidence is more believable than the evidence supporting applicant's guilt," and stating that the "actual innocence conclusion does not logically flow from the record evidence"). The Court in *Brown* additionally observed that the conclusion that the complainant in that case was an "accomplished liar" at the age of seven was "contradicted" by the trial testimony of a police officer who had specialized training in interviewing child sex-abuse victims, and it further noted that the habeas court "never mentioned [the officer's] testimony or explained why his expert testimony was not credible and should be rejected." *Id*. at 549. Similarly, here the complainant's global denial of sexual abuse after a more than ten-year delay does not rise to the level of clear and convincing evidence to show that no reasonable juror would have convicted applicant in light of that evidence. *See id.* at 547; *Elizondo*, 947 S.W.2d at 209-10. Applicant does not adequately explain, nor did the habeas court fully address, why the complainant's new recantation testimony should be deemed more believable than the evidence establishing applicant's guilt, including the expert medical testimony of Dr. Kellogg and the expert testimony of CPS investigator Amanda Way. *See Brown*, 205 S.W.3d at 548.

---

[3](...continued)
and forth, inconsistent stories," applicant had failed to meet his burden under *Elizondo*. *See id.* at *20 (citing *Elizondo*, 947 S.W.2d at 206).

We further observe that, at the time that it convicted applicant, the jury was aware that the complainant had recanted on a prior occasion, having previously indicated to a CPS interviewer that her grandmother "had told a lie" about the allegations against applicant. Although the present recantation is new in that it comes from the now-adult complainant, in terms of its substance, it is largely redundant of the recantation evidence that was presented to and disregarded by the jury at applicant's trial.[4] Under these circumstances, we will not circumvent a jury's determination of guilt that was the result of the jury having considered and rejected the precise defensive theory presented on habeas review merely on the basis that the evidence is now coming from an adult witness rather than a child.[5]

### 2. Recantation Evidence Provides No Alternative Explanation for Medical Evidence

At applicant's trial, the jury received testimony from Dr. Kellogg indicating that the complainant's genitals showed "definitive" physical signs of sexual penetration. Dr. Kellogg stated that the complainant, at five years of age, had "very little hymen" and her genital area showed signs of "trauma" indicative of repeated penetration. Even applicant's own medical expert at trial, Dr. Navar, who indicated that the medical evidence was not definitive

---

[4] *See Ex parte Brown*, 205 S.W.3d 538, 545-46 (Tex. Crim. App. 2006) (observing that "newly discovered" or "newly available" evidence refers to evidence that "was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence").

[5] Perhaps this type of situation would be better analyzed within the scope of this Court's false-evidence jurisprudence, but applicant has not raised that claim in this application. *See Ex parte Weinstein*, 421 S.W.3d 656, 664-65 (Tex. Crim. App. 2014) (describing standard that applies to Court's review of false-evidence claims raised on application for writ of habeas corpus).

evidence of sexual abuse, opined that the condition of the complainant's hymen could be consistent with sexual abuse and suggested that the kind of hymenal attenuation exhibited by the complainant would be present in a very small percentage of normal, non-abused children at that age. In sum, the testimony from both the State and the defense medical experts reflected that the complainant had an attenuated hymen that was highly abnormal for her age and consistent with, if not determinative of, sexual abuse. The complainant's recantation does not explain the medical findings by contending that another person sexually abused her, nor does she specifically recall her interactions with applicant. Because a reasonable juror might have convicted applicant on the basis of this medical testimony, notwithstanding the new recantation evidence, we conclude that applicant has failed to establish actual innocence under the prevailing standard. *See Elizondo*, 947 S.W.2d at 209.

Furthermore, given the existence of inculpatory medical evidence in this case, it is distinguishable from other cases in which this Court has granted relief on the basis of actual innocence under circumstances in which there was no physical or medical evidence to suggest that the abuse had actually occurred. *See, e.g.*, *Thompson*, 153 S.W.3d at 418, 420 (granting relief on basis of recantation from complaining witness, in part, because results of complaining witness's sexual-assault examination were "completely normal"); *Elizondo*, 947 S.W.2d at 209-10 (granting relief in actual-innocence case where conviction was based "solely" upon testimony of recanting witness, and noting that there was a "complete lack" of any other inculpatory evidence, either "direct or circumstantial"). In *Thompson*, the expert

medical witness had testified at trial that "the lack of physical evidence of sexual abuse was . . . consistent with digital penetration," but he did not definitively or affirmatively testify that sexual abuse had occurred. *Thompson*, 153 S.W.3d at 418. And in *Elizondo*, no medical testimony or physical evidence was presented to the jury. *See Elizondo*, 947 S.W.2d at 209-10. Unlike both *Thompson* and *Elizondo*, the medical evidence presented at trial in this case was, at the very least, strongly suggestive of sexual abuse having occurred. Applicant has neither presented any evidence to show that Dr. Kellogg's and Dr. Navar's testimony was inaccurate, nor has he provided an alternative explanation for the medical findings. Having weighed the new recantation evidence against the evidence of guilt adduced at trial, including the medical evidence, we conclude that it does not rise to the level of clear and convincing evidence to establish that no reasonable juror would have convicted applicant in light of the new evidence. *See id.* at 206 (requiring reviewing court to "weigh" new evidence against old evidence to assess "probable impact" upon State's case as a whole; applicant entitled to relief if he demonstrates that no reasonable juror would have convicted him in light of new evidence); *see also Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011) (stating that, in evaluating actual-innocence claim, reviewing court must view new exculpatory evidence "in the context of the inculpatory evidence in the record," and denying relief because a juror could "reasonably conclude" that applicant was guilty even in light of new evidence).

### 3. Habeas Court's Credibility Determination Does Not Compel Granting Relief

Although the matter of a recanting witness's credibility may be highly relevant to determining whether an applicant has met his burden of proof under *Elizondo*, it is not necessarily dispositive of the legal question of whether the newly discovered evidence would have convinced the jury of applicant's innocence. *See Elizondo*, 947 S.W.2d at 210 (granting relief, in part, because "another jury hearing the evidence, including the newly discovered mature recantation of [the complainant's] juvenile testimony, would view the new evidence as the more credible and would acquit applicant"); *see also Brown*, 205 S.W.3d at 547 (describing relevant inquiry as being whether new evidence "is more believable than the evidence supporting applicant's guilt"). To the extent the habeas court in the present case concluded that applicant was entitled to relief based solely on its assessment of the complainant's credibility at the time of her recantation, we reject that conclusion as being based on an improper legal standard, and we reiterate the correct standard as being the rule established in *Elizondo*. *See Elizondo*, 947 S.W.2d at 209-10.

Relying on the complainant's 2011 recantation, which it found was more "credible and believable" than her trial testimony, the habeas court concluded that "no rational jury would convict the Applicant in light of the new evidence." The habeas court's analysis appears to have been based on an assessment of the complainant's credibility and of whether her recantation testimony was more credible than her trial testimony, rather than on an assessment of the probable impact of her new recantation testimony on the State's case as a whole. *See id.* at 206. Even if we were to defer to the habeas court's finding that the

complainant's recantation testimony at the habeas hearing appeared more credible than her trial testimony, that does not necessarily establish that applicant has met the relevant standard set forth in *Elizondo*, that is, that he has demonstrated by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. *See id.* at 209. That inquiry requires a reviewing court to take account of the entirety of the trial and habeas records as a means of determining whether an applicant has met his burden. *See id.* at 206 (describing role of reviewing court as broadly "weigh[ing] such [new] exculpatory evidence against the evidence of guilt adduced at trial"). Viewed in that light, applicant has failed to unquestionably establish his innocence. *See id.* at 209.

### III. Conclusion

Applicant had the burden to demonstrate by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. *See id.* Having conducted an independent review of both the trial and habeas records in this case, we conclude that applicant has failed to meet this burden. Relief is denied.

Delivered: June 18, 2014

Publish