WR-77,157-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/30/2015 6:45:27 PM
Accepted 7/31/2015 8:38:50 AM
ABEL ACOSTA
CLERK

RECEIVED IN
COURT OF CRIMINAL APPEALS

JULY 31, 2015

ABEL ACOSTA, CLERK

No. WR-77,157-02

| EX PARTE DANIEL LEE LOPEZ, | | IN THE |
| Applicant. | | |
| | | COURT OF CRIMINAL APPEALS |
| | | |
| | | OF TEXAS |

CAUSE NO. 09-CR-0787-B

| EX PARTE DANIEL LEE LOPEZ, | | IN THE 117TH DISTRICT |
| Applicant. | | |
| | | COURT OF |
| | | |
| | | NUECES COUNTY, TEXAS |

## STATE'S MOTION TO DISMISS
## APPLICANT'S SUBSEQUENT APPLICATION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through the District Attorney for the 105th Judicial District of Texas, and files this, its motion to dismiss Applicant's "Subsequent Application for Postconviction Writ of Habeas Corpus" and would show the following:

I.

Procedural History of this Case

Applicant was convicted of capital murder and sentenced to death on the 5th

1

day of March, 2010, for murdering a police officer a year earlier.[1]

The verdict and judgment in Applicant's case were reviewed on direct appeal by this Court, which affirmed such judgment on October 12, 2012, *see Lopez v. State*, No. AP-76,327, 2012 WL 5358863, 2012 Tex. Crim. App. Unpub. LEXIS 1159 (Tex. Crim. App. Oct. 31, 2012) (not designated for publication), and subsequently issued its mandate on November 27, 2012.

On April 18, 2012, this Court accepted Applicant's waiver of appointment of counsel to represent him in a post-conviction writ of habeas corpus under Tex. Code Crim. Proc. art. 11.071 and found that his failure to timely file an application for habeas corpus relief under that article constituted a waiver of all grounds for relief that were available to him before the last date on which his application could have been timely filed. *See Ex parte Lopez*, No. WR-77,157-01, 2012 Tex. Crim. App. Unpub. LEXIS 1376 (Tex. Crim. App. Apr. 18, 2012) (not designated for publication).

On July 1, 2014, the United States District Court for the Southern District of Texas found Applicant competent to waive federal habeas review, found that he

---

[1]As this Court noted in its opinion on Applicant's direct appeal, the jury also convicted him of nine other offenses arising out of the same episode: assault on a public servant, attempted aggravated assault on a public servant, the attempted capital murders of five peace officers, evading arrest or detention using a vehicle and causing death, and possession of a controlled substance with intent to deliver.

did so knowingly and voluntarily, granted his motion to dismiss his habeas action with prejudice, denied the post-judgment motion filed by his attorneys (the same attorneys who have filed the present subsequent application), found that he was competent to terminate representation by habeas counsel, and granted his motion to dismiss counsel, effective on the conclusion of any appeal. *See Lopez v. Stephens*, Civ. No. 2:12-CV-160, 2014 WL 2981056, 2014 U.S. Dist. LEXIS 89213 (S.D. Tex. July 1, 2014) (unpublished).

Upon such appeal by counsel who were appointed for Applicant by the federal district court against his will and who filed such appeal despite the defendant's wishes (the same attorneys who have filed the present subsequent application), on April 6, 2015, the United States Court of Appeals for the Fifth Circuit affirmed the district court's order finding Applicant competent to waive federal habeas proceedings and ordered that no further pleadings would be accepted from counsel absent leave of court supported by Applicant's election to proceed through such counsel. *See Lopez v. Stephens*, 783 F.3d 524 (5th Cir. 2015), *petition for cert. filed*, No. 15-5141 (U.S. July 10, 2015).

On or about April 13, 2015, the convicting court received a *pro se* "Motion to Declare Information About Appeal and Execution," wherein Applicant asked such court to set his execution date.

Applicant's conviction having become final, on May 12, 2015, the convicting court, in accordance with Tex. Code Crim. Proc. art. 43.141, entered an order setting Applicant's execution for August 12, 2015.

On July 6, 2015, a petition for writ of certiorari was filed on behalf of Applicant by at least one of the same attorneys who has filed the present subsequent application. The case was docketed by the Supreme Court on July 10, 2015, and the State's response is due to be filed in that court by August 10, 2015, two days before Applicant's scheduled execution. *Lopez v. Stephens*, No. 15-5141 (U.S. July 10, 2015) See:

http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles\15-5141.htm

On July 22, 2015, the District Attorney received notice from the Texas Board of Pardons and Paroles that it had received a request, filed on behalf of Applicant by at least one of the same attorneys who has filed the present application, for Board consideration of commutation of Applicant's death sentence to a lesser penalty. The District Attorney responded to that request on July 27, 2015, notwithstanding the fact that he has never received a copy of such request.

On July 27, 2015: (1) a "Suggestion that the Court, on its Own Motion, Reconsider its Decision Accepting Daniel Lee Lopez's Waiver of State Habeas Review"; (2) a motion for stay of execution while the Court considers that

4

"Suggestion," (3) a motion for leave to appear in this Court to present that "Suggestion"; (4) a motion for leave to appear in this Court to present a subsequent application for writ of habeas corpus; and (5) a motion for stay of execution while the Court considers that subsequent application for writ of habeas corpus, were all filed this Court on behalf of Applicant by the same attorneys who have filed the present application.

On July 28, 2015, the present "Subsequent Application for Postconviction Writ of Habeas Corpus," which asserts a claim of actual innocence, was filed on behalf of Applicant. In such application, counsel prays that this Court stay his execution, find that the claim raised therein satisfies Article 11.071, § 5, and remand this case to the convicting court to allow counsel "to develop additional evidence in support of this claim and either a new trial or an evidentiary hearing to make findings on [their] claim that [Applicant] is actually innocent."

It is unclear whether Applicant is aware of this subsequent application, the clemency petition, the petition for writ of certiorari, the "Suggestion" that this Court "on its own motion" reconsider its decision accepting Applicant's waiver of state habeas review, the motions for stay of execution, and the motions for leave to appear, much less whether he authorized their filing on his behalf by the attorneys he sought to dismiss .

5

On July 30, 2015, the State filed this motion to dismiss Applicant's subsequent application for habeas corpus, contending that the requirements of Article 11.071, § 5(a) have not been satisfied, and requesting that, for that reason, this Court enter an order dismissing his application as an abuse of the writ. See Tex. Code Crim. Proc. Ann. art. 11.071, § 5(c) (West 2015). One version is being filed with the clerk of the convicting court, and an alternate version, with this Court and its cause number in the caption, is being electronically filed with this Court.

In support of that motion, the State shows the following:

II.

Basis for Dismissing Applicant's Subsequent Application

III.

*The standard*

If a subsequent application for a writ of habeas corpus is filed in a death penalty case asserting a claim of actual innocence, as Applicant does here, a court may not consider the merits of or grant relief based on the subsequent application unless this Court finds that the application contains sufficient specific facts establishing that, by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty

6

beyond a reasonable doubt. *See* Tex. Code Crim. App. Ann. art. 11.071, §5(a)(2), (c) (West 2015).

To prevail in a freestanding claim of actual innocence, an applicant must prove by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence. *Ex parte Harleston*, 431 S.W.3d 67, 70 (Tex. Crim. App. 2014). The burden placed upon the applicant to prevail in such a claim is a "Herculean task," *id.*, and relief is not warranted without an applicant having made an exceedingly persuasive case that he is actually innocent. *See Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014). To do so, the applicant bears the burden to prove that, if true, the newly discovered evidence not only casts a sufficient doubt to undermine confidence in the verdict, but it also creates a probability that the verdict would be different on retrial. *See Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996), *superseded by statute for death penalty cases as recognized in Ex parte Blue*, 230 S.W.3d 151, 162 n.46 (Tex. Crim. App. 2007). To determine whether an applicant has met this standard, the habeas court must examine the new evidence in light of the evidence presented at trial. *See Navarijo*, 433 S.W.3d at 567.

## IV.

*The gist of Applicant's contention*

Applicant asserts that had he testified during his trial that he didn't intentionally kill Lt. Alexander, as he did during a hearing in federal court to determine his competency to waive federal review of his conviction, and had evidence been admitted regarding his poor vision, his wearing contact lens at the time of he struck Lt. Alexander that he had purchased off the streets and that weren't prescribed to him, and that at the time he struck Lt. Alexander, his eyes were burning from his being pepper-sprayed earlier that evening, no rational juror could have found him guilty of capital murder.

## V.

*But Applicant's contention takes a lot for granted*

This contention presupposes that the jury would have *believed* such testimony had it been offered. And that no rational juror could *not* have believed such testimony. But consider some of the facts that this Court discussed in its opinion on Applicant's direct appeal.

Appellant overlooks the fact that the jury also found him guilty of the attempted capital murders of five other peace officers. Slip op. at 10. Did he not intend any of those either?

8

And did his vision and the effects of pepper spray prevent him from seeing Officer Cox, whom he had previously assaulted, when Applicant twice put his Expedition in reverse and attempted to ram Cox's vehicle, causing Cox to drive onto curbs and sidewalks to avoid being hit? Could he not see Officer Ressler when he was driving toward her at full speed and she had to sharply pull over to the side of the road to avoid being hit head-on by Applicant? Or when he put his Expedition in reverse and attempted to ram her vehicle? Could he not see Officer Ybarra when Applicant made a U-turn during the pursuit and drove straight toward Ybarra and Officer Cox, causing both of them to swerve out of his way? Could Applicant not see the officers when he then made another U-turn and drove toward them, forcing them to move out of his way? Or when he put his Expedition in reverse, rammed the rear bumper of Ybarra's vehicle, and drove away? Did Applicant not see Officer Jasso or attempt to run into him when Jasso said Applicant drove straight toward him, ran a stop sign, and made a "very specific jerk" in his direction, forcing Jasso to drive "[a]bout two feet up onto the curb" to avoid being struck by Applicant's Expedition, as Applicant screamed out his window at Jasso as he passed him? Slip op. at 5-6.

Could he not see the stop sticks that Officer Cunningham placed on the road and was he just lucky when he swerved around them? Could he not see another set

9

of stop sticks that were placed in his path after striking Lt. Alexander and was he again just lucky when he avoided them? Slip op. at 6-7.

Could Applicant not see the patrol cars containing Officers Carrazco, Muniz, and McDonald that he began ramming once he was surrounded? Could he not see Officer Carrazco, who testified that when he exited his vehicle and drew his gun after his patrol car was rammed by Applicant, Applicant looked directly at him and "immediately gunned it" with his wheels spinning, forcing Carrazco to jump over the hood of a patrol car to avoid being run over by Applicant? Slip op. 7-8.

And would the jury necessarily have believed Applicant if he testified, as he did during his federal court hearing, that he wasn't going more than 2-3 m.p.h. when he rammed the police cars that had surrounded him? (Subsequent Application Ex. B, p. 86 [hereinafter "Ex. B"]). Or could a rational juror, as a judge of the credibility of the witnesses, have believed the officers who testified that as Applicant rammed their vehicles with his Expedition, he was using it as a "battering ram," while spinning his wheels and revvivng his engine, and that he rammed one car hard enough that it pushed that car onto the grass and within a few feet of a steep embankment. Slip op. at 7-8.

Had Applicant testified at trial as he did during his federal court hearing,

would a rational juror have had to believe he didn't intentionally or knowingly cause Lt. Alexander's death, in spite of the fact that he boasted to jailers that he was "the cop killer everyone has been talking about?" And in spite of the fact that Applicant found it humorous that he would probably be charged with capital murder and would probably be incarcerated "forever," because, as he told a jailer, "it doesn't make any difference because as cop killers, when we go to T.D.C., we're kings" and would not "want for anything?" Slip op. at 9.

In sum, would a rational juror *have* to have concluded, had Applicant testified during his trial as he did during his federal court hearing, that he was telling the truth and that he didn't intend to run into Lt. Alexander that night, and that he was little more than a Mr. Magoo, accidently driving toward everyone who was pursuing him because of his vision problems, a bad set of contact lens, and the effects of pepper spray?

Or could a rational juror have believed Applicant's brother, who testified that Applicant was a good driver and had practiced evasive driving maneuvers? And that during the chase through their neighborhood, Applicant was able to avoid at least six police cars pursuing him and that he ran into several police cars before doing a "doughnut in reverse" and taking off? (19 R.R. at 137-142, 144, 146, 148-150).

11

And might a rational juror have believed Applicant's testimony during his federal court hearing wherein he said that when he had the contact lens in question on, he "could read from far away." (Ex. B, p. 73).

VI.

*And this "new" evidence is neither new nor significant*

As this Court noted in its opinion on Applicant's direct appeal, the jury heard testimony from his brother, his mother, and his ex-girlfriend. Applicant told his brother and ex-girlfriend that he thought he hit a police officer, and he told his mother that he thought "he ran over somebody." When his mother later visited Applicant in the hospital, he said, "They tell me I killed somebody" and explained that he "couldn't see" because "they had pepper sprayed him." However, Officer Cox testified that the pepper spray hit Applicant on the side of the head but not in his eyes, and other officers testified that he did not appear to have been affected by the pepper spray when he was taken into custody. Officer Garcia testified that he heard Applicant tell his mother at the hospital that he "tried to stop before [he] hit the officer." Garcia added that there were no brake lights seen or skid-mark evidence to substantiate that explanation. Slip op. at 8-9.

And in addition to what this Court noted in its opinion:

(1) Applicant's ex-girlfriend testified that during one of numerous phone

12

calls made between her and Applicant while the chase was underway, he told her that he "ran over a cop" and thought he had killed him. She said Applicant's voice was calm and that he never indicated whether he had intentionally or accidentally done so. (16 R.R. at 316- 318, 321-333; 30 R.R. at State's Ex. 46).

(2) Applicant's brother testified that during one of the phone conversations between Applicant and his ex-girlfriend, he (Applicant's brother) grabbed the phone from her and again told Applicant to stop. However, Applicant replied, "No, because now there's really something. They're probably going to want to kill me because I hit a cop ... Joey, I'm sorry, I think I hit a cop. I don't know what to do." Applicant's brother was puzzled by the latter statement, noting that if you hit something with a vehicle, you know it. However, he said Applicant did not indicate that he had done so on purpose. (19 R.R, at 138-139, 144-145, 147-149, 151).

(3) Applicant's mother testified acknowledged that although Applicant told her when she visited him in the hospital, "Mom, they tell me I killed somebody." When she replied, "Yes, the officer," Applicant replied, "Mom, I couldn't see." She said Applicant told her that the reason he could not see was because he had been pepper-sprayed. Applicant's attorney reenforced that fact by asking her a number of times if Applicant said he couldn't see. She acknowledged that she had

13

not mentioned that before trial but said that was because she had not been asked. Detectives Rodriguez and Garcia, who were in the hospital room at the time, both testified that Applicant's mother never conveyed that information to them when they interviewed her. Garcia also testified that Applicant never mentioned pepper spray during the hospital visit. He did, however, testify, as this Court noted in its opinion, that Applicant told his mother, "I tried to stop before I hit the officer." (17 R.R. at 55-60; 20 R.R. at 186-193, 242-249, 256-258).

(4) A woman with whom Applicant had lived for four years as a teenager when he was dating her daughter, testified that Applicant wrote her several letters about a month after Lt. Alexander's death. In one of them, Applicant explained why he had done what he had done. However, she testified, in Applicant's letters, he never said that he had struck Alexander on purpose or that he had done so accidentally. (20 R.R. at 227-238; 34 R.R. at State's Ex. 248).

Indeed, the basis for this subsequent application is no different than what was also presented as the defensive theory at trial. As the federal district court noted:

> [Applicant's] intent in killing Officer Alexander was the primary concern for jurors. To secure a capital conviction, the State had to prover beyond a reasonable doubt that [Applicant] intentionally or knowingly killed the victim. ... The State argued that the jury could infer [Applicant's] intent from the circumstances surrounding the

14

murder, including: [Applicant's] repeated efforts to avoid arrest, his violence against the officer who first pulled him over, his attempts to run over other officers, and testimony from eyewitnesses that he maneuvered his vehicle directly into the victim. ... The State also emphasized that [Applicant] previously said he would "do everything in his power to resist" arrest and "would die before" he "went back to jail."

The defense vigorously argued that [Applicant] lacked the intent necessary for a capital murder conviction. According to the defense, [Applicant] was traveling at a high rate of speed as he approached the stop sticks manned by Officer Alexander. [Applicant] swerved to avoid the stop sticks, but because of poor lighting and pepper spray in his eyes, he never saw the officer. Under those circumstances, trial counsel urged the jury to find [Applicant] guilty of only a lesser offense. The jury found [Applicant] guilty of capital murder.

*Lopez v. Stephens*, 2014 WL 2981056, at \*3.

The only thing "new" that Applicant proffers in his subsequent application is that he testified during his federal court hearing that he didn't intentionally kill Lt. Alexander, whereas his statements to that effect came in through other witnesses at trial because he didn't testify at that time. But there was nothing to prevent him from doing so. And this "new" evidence is therefore not significant.

Also "new" are the proffered two 2010 visual acuity tests reflecting Applicant's poor vision a year after Lt. Alexander's was run down, and Applicant's testimony at the federal court hearing that the contacts he was wearing at the time of Alexander's death weren't prescribed to him but rather were

15

purchased "on the streets." But he also testified at that hearing, as noted above,

that when he had the contact lens in question on, he "could read from far away."

So this "new" evidence is not significant either.

VII.

*And the federal courts were not persuaded by the same arguments*

Although he doesn't mention this in his subsequent application, Applicant

raised a similar argument in his appeal from the federal district court's order

finding him competent to waive federal review of his conviction and sentence. But

the Fifth Circuit found that it unpersuasive, noting:

> On appeal, two arguments are asserted. First, the argument is offered
> that [Applicant] is incompetent to waive habeas review because he is
> wrong to think further judicial review would be unavailing. Specifically, counsel
> contends that [Applicant's] sight was impaired both by his poor vision and also by
> pepper spray, and therefore he did not intentionally kill Lieutenant Alexander
> when he swerved and struck him during a police chase. This argument fails on
> several grounds. Factually, the jury heard testimony and attorney argument
> relating to the fatal impact—and specifically, disputed facts as to [Applicant's]
> intentionality and vision—and, properly instructed as to the proof required of
> [Applicant's] state of mind, thereafter entered its verdict of capital murder.

*Lopez v. Stephens*, 783 S.W.3d at 526.

> In a footnote, the court added:

> In district court, counsel acknowledged that the "chief issue, the
> central issue at trial was whether [Applicant] saw Officer Alexander
> and intentionally ran him over," but suggested that the jury had not
> heard all relevant evidence pertaining to [Applicant's] impaired

16

vision. As the district court catalogues, however, the pepper spray evidence was presented to the jury. Moreover, in district court, having heard counsel characterize him as legally blind, [Applicant] himself explained that yes, he has "terrible vision," "but I had contacts, and I could see."

*Lopez v. Stephens*, 783 S.W.3d at 526 n.2.

Thus, in his subsequent application, Applicant is simply re-urging the same argument that Fifth Circuit found unpersuasive.

## VIII.

*Applicant has failed to make a threshold showing under Article 11.071, § 5(a)(2).*

Applicant contends in his subsequent application and in his motion for stay of execution that this Court should enter an order finding that the requirements of Article 11.071, § 5(a)(2) have been satisfied. But for the reasons discussed above, they have not.

Applicant has not proved by clear and convincing evidence that, despite the evidence of guilt that supports his conviction, no reasonable juror could have found him guilty in light of the "new" evidence he proffers in his subsequent application—evidence that is essentially that which was presented to, but rejected by, the jury during his trial, and which the Fifth Circuit did not find persuasive in his appeal from the federal district court's order finding him competent to waive federal review of his conviction and sentence. And as such, his subsequent

17

application for writ of habeas corpus does not contain sufficient specific facts establishing that, by a preponderance of the evidence, but for a violation of the United States Constitution no rational trier of fact could have found the applicant guilty beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(2) (West 2015).

## IX.

## Conclusion

Because Applicant has failed to make a threshold showing that the requirements of Article 11.071, § 5(a) have been satisfied, the State's motion to dismiss Applicant's "Subsequent Application for Postconviction Writ of Habeas Corpus" should be granted.

WHEREFORE, the State prays this Court find that the requirements of Article 11.071, § 5(a) have not been satisfied, and that it therefore enter an order dismissing Applicant's subsequent application for writ of habeas corpus as an abuse of the writ, pursuant to Tex. Code Crim. Proc. Ann. art. 11.071, § 5(c) (West 2015).

Respectfully submitted,

/s/ *James D. Rosenkild*
James D. Rosenkild
State Bar No. 17279200
Assistant District Attorney
901 Leopard St., Rm. 206
Corpus Christi, Texas 78401-3602
(361) 888-0410
(361) 888-0700 (fax)
james.rosenkild@co.nueces.tx.us

## CERTIFICATE OF COMPLIANCE

This is to certify that the word count of the computer program used to prepare this motion indicates that such motion contains 4,013 words, not counting the following, if part of this motion: the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. *See* Tex. R. App. P. 9.4(i).

/s/ *James D. Rosenkild*
James D. Rosenkild

## CERTIFICATE OF SERVICE

This is to certify that a copy of this motion to dismiss was served this 30th day of July, 2015, via certified electronic service provider on David R. Dow, Esq., at ddow@central.uh.edu (and mailed to him at University of Houston Law Center, 100 Law Center, Houston, TX 77204-6060), and on James Gregory Rytting, Esq., at james@hilderlaw.com (and mailed to him at Hidler & Associates, 819 Lovett Blvd., Houston , TX 77006-3905), and was mailed to Applicant, TDCJ #999555, TDCJ-CID, Polunsky Unit, 3872 FM 350 South, Livingston, TX 77351.

/s/ *James D. Rosenkild*
James D. Rosenkild

19