

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-64,017-05

### EX PARTE CHRISTOPHER EUGENE WIMBERLY, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 54,705-E IN THE 27TH DISTRICT COURT
### BELL COUNTY

RICHARDSON, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, ALCALA, NEWELL, KEEL, and WALKER, JJ., joined. YEARY, J., filed a concurring opinion.

## OPINION

Applicant, Christopher Eugene Wimberly, was convicted of aggravated robbery and

sentenced to fifty years' imprisonment. Applicant claims in this fifth writ application that

he is actually innocent of this offense based on newly available evidence—specifically, the

confession by another prison inmate.[1] We have reviewed the entire record and find that it

---

[1] TEX. CODE CRIM. PROC. art. 11.07. Applicant's first application was dismissed by this Court because it was filed while his direct appeal was pending. *Ex parte Wimberly*, No. WR-64,017-01 (Tex. Crim. App. Feb. 22, 2006). This Court granted relief on Applicant's second writ application which sought an out-of-time petition for discretionary review. *Ex parte Wimberly*, No. WR-64,017-02, 2006 WL 1544656 (Tex. Crim. App. June 7, 2006) (not designated for publication). Applicant's third writ

supports the trial court's findings. The other inmate's confession to the crime is not persuasive and not credible. Deferring to the findings made by the trial court, which are supported by the record, we hold that Applicant has not met his burden to prove that he is actually innocent of this offense. We agree with the trial court's recommendation and deny relief.[2]

## THE AGGRAVATED ROBBERY

Late at night on December 23, 2002, an aggravated robbery occurred at the Pizza Hut on Rancier Avenue in Killeen, Texas. Several employees who were working that night gave voluntary written statements to the police. Phillip Wynn, a fifteen-year Army Staff Sergeant, was working part time for extra money at the Pizza Hut. He stated that at about 10:45 p.m. he was walking out the back door with a pizza delivery when a black male stuck a shotgun in his chest and forced him back into the Pizza Hut. In his statement, Mr. Wynn claimed to have gotten the "best look at the robber." He described him as "wearing all dark clothing with a hood pulled over his head," "carrying what looked like a twelve gauge shotgun," "early thirties," and "about six feet tall." He said he would be able to recognize him if he saw him again.

---

application was denied, *Ex parte Wimberly*, WR-64,017-03 (Tex. Crim. App. Sept. 12, 2007), and his fourth writ application was dismissed as a subsequent writ. *Ex parte Wimberly*, No. WR-64,017-04 (Tex. Crim. App. May 8, 2013).

[2] The same trial court judge presided over both the trial and the evidentiary writ hearing.

Consistent with his statement, Mr. Wynn testified at Applicant's trial, which took place on or about October 20, 2003, that just before 11:00 p.m. on December 23, 2002, he went out the back door of the Pizza Hut. He was getting ready to load pizzas into his car to deliver to a local shopping mall. Mr. Wynn said that "this guy [came] up out of the darkness," and "put a weapon in [his] chest," and "told [him] to get [his] ass back in the store." Mr. Wynn identified the weapon as a 12 gauge pump shotgun. The robber told Mr. Wynn to put down the pizzas and get on the floor. When shown a photo line-up, Mr. Wynn testified that he could identify Applicant as the robber with 100 percent certainty:

Q. Now, how was he dressed?

A. He had a dark jacket with a hood on it and had it pulled down, had the front of the hood pulled down maybe right here. It was right here.

Q. Okay.

A. And I was looking at—more at his eyes than anything else. I glanced at the weapon a couple of times, but I was paying more attention to his face, his eyes.

Q. Okay. And did the police officer that was talking to you out there at the scene did he ask you if you would be able to recognize him if you saw him again?

A. By his eyes, sir. I stood three feet from him. Seemed like I was looking at him for eternity before he made me lie on the floor.

Q. Now, at some later time did you look at some photographs?

A. Yes, sir.

Q.     Did Detective Ortiz show you sheets that had like six photographs on it?

A.     Yes, sir, he did.

Q.     Were you able to identify him?

A.     Yes, sir.

* * *

A.     I told Detective Ortiz that I was 100 percent sure that that was the man that robbed us that night.

Q.     The man that stuck the shotgun in your chest?

A.     The man that had a shotgun to my chest, yes.

Q.     Okay. Now, have you had an opportunity to look at that man over there?

A.     When I first came in the door, sir.

Q.     Okay. You can look at him now. Does he look like the man that put the shotgun in your chest?

A.     Yes, sir.

* * *

[*On cross examination*]

Q.     You identified Christopher Wimberly as the gentleman who came in and robbed that Pizza Hut. Looking at him now here in this light is this gentleman the same height and weight as you remember that robber?

A.     Yes, sir.

Q.     You're 100 percent sure?

A.     Yes, I am, sir.

The store manager was a man named Gerard Gioioso.[3]  His written statement given the night of the robbery identified the robber as "a black man wearing a black coat and a hood, carrying a twelve gauge shot gun."  Mr. Gioioso said the robber was "about 6 feet tall," he had a mustache, and he was "about 35 years old," and "200 lbs or so."  Mr. Gioioso testified at Applicant's trial that he was there that night working on inventory, and his shift manager, Aida Rodriguez, was running the Pizza Hut that evening.  Mr. Gioioso testified that, about 10:44 p.m. on December 23, 2002, he was at his desk conducting his inventory when he noticed Phillip Wynn being escorted back into the back door.  "There was a guy there with a gun in his chest pushing him back into the store."  Mr. Gioioso, who was about six feet away, identified the gun as a short barrel shotgun.  Mr. Gioioso then described the robber:

Q.     The individual who was handling the gun could you describe him to us?

A.     Yeah, he was – he was a black gentleman with a heavy, heavy black coat on, one of those feather [sic] coats, I guess.  We have them up north in Massachusetts, so really heavy coat.  The hood was pulled up.

---

[3] In the court of appeals's opinion, Mr. Gioioso's name is spelled "Giosio." *Wimberly v. State*, No. 03-03-00726-CR, 2005 WL 2573524 (Tex.App.—Austin 2005, pet. ref'd) (mem. op., not designated for publication).  However, in the Killeen Police Department Supplemental Report, in the State's brief,  in the Appellant's Brief filed with this Court, and in the transcripts of the trial and the writ hearing, his name is spelled "Gioioso."

And the draw string, it's a hood with a draw string, you draw it and it squishes the face area and it was squished to right about here.

Q.    I see.  So when you say about here and you motioned that it's from about the mouth area all the way up to the top of the eyes?

A.    Correct.

Q.    So by looking at the person you could see the eyes, the nose, the cheeks, the mouth?

A.    Correct.

Mr. Gioioso then testified that he asked what was going on, and the robber turned the gun on Mr. Gioioso and demanded money.  He said, "No problem . . . we'll get you the money."  Mr. Gioioso walked toward the front of the store while the robber held the gun to Mr. Gioioso's back.  The shift manager, Aida Rodriguez, who was facing the register, took out money and laid it on the counter.  The robber then told everyone to get on the floor, and he left out the back door.  Mr. Gioioso was able to identify Applicant in court.   Mr. Gioioso also testified that he did not see if the robber was wearing gloves.  On cross examination, Mr. Gioioso further described the robber as being a "few inches" taller than he is:

Q.    And how tall are you?

A.    I'm 5' 9."

Q.    And how much do you weigh?

A.    About 230.

Q.    And was the robber taller than you?

A.      Yes.

Q.      About how much taller?

A.      I'd say a few inches.

Q.      And this is going to call for a guess on your part but how tall is Mr. Wynn, about?

A.      I don't know.

Q.      Tall as you?

A.      No.  He's a little bit taller than me.

Q.      And is – was the robber as tall as Mr. Wynn as you remember it looking at him?

A.      I believe the – I believe Mr. Wynn is not as tall as the robber.

Q.      The robber then being taller?

A.      Correct.  Not much but taller probably.

When Applicant's lawyer, intimating that he stands about 6 feet tall, stood next to Applicant and asked Mr. Gioioso if the robber was "as tall as Mr. Wimberly," Mr. Gioioso testified that he was. Also on cross examination, Mr. Gioioso testified that he was 80 percent sure when he identified Applicant in the photo lineup:

Q.      Were then additional photographs shown to you?

A.      Yes.

Q.    Did you state to that officer that one of those pictures in that photo
       lineup resembled the suspect that robbed you?

A.    Yes.

Q.    But you were only 80 percent sure?

A.    Correct.

Q.    Meaning you weren't absolutely sure?

A.    Correct.  That's why I said I was 80 percent sure.

On redirect examination, Mr. Gioioso reiterated that the robber "was a black male, approximately 6' tall and in and around 200 pounds."  He estimated the robber's age to be "in his early to mid 30s." Mr. Gioioso also said that the robber had a mustache and probably a beard ("some growth coming down the sides towards his mustache").

The other employees working at the Pizza Hut that night gave written statements on the night of the robbery, but they did not testify at trial.  Aida Rodriguez said in her statement that the robber was a "black male wearing all dark," "and he had a shotgun."  She described him as "chunky."  Thomas Boles said that the robber was a black man "about 6'1" and was carrying "a pump action shotgun."  Jared Castro said in his statement that the robber was a black male "wearing a big hooded jacket with a pump action shotgun."  David Sawchak said in his statement that the robber was "a black man in a thick black jacket with a shotgun."  He said "the man had a beard and was about 5'7" to 5'9" tall and looked to be about 25–30."

The officer who testified said that there was no physical evidence at the scene, and there were no fingerprints. He also testified that there had been a large number of robberies at fast food restaurants in that area at the time of the Pizza Hut robbery.

Applicant's defense at trial was that the State had charged the wrong man. The jury found Applicant guilty of aggravated robbery, and he was sentenced to fifty years' imprisonment.

## POST-CONVICTION

On direct appeal, Applicant raised two points of error—that the evidence was factually insufficient to support Applicant's conviction, and his trial counsel was ineffective for failing to present expert witness testimony on eyewitness identification procedures. The Third Court of Appeals rejected both points and affirmed Applicant's conviction.[4] Over the course of the next nine years, Applicant filed four writ applications seeking post conviction relief.[5]

In September of 2014, Applicant filed this fifth writ application. He claims that he is actually innocent based on newly available evidence—an affidavit from Royry Glenn Tones, wherein Tones purportedly takes sole responsibility for committing the aggravated robbery for which Applicant was convicted.[6] Applicant submitted with his writ application

---

[4] *Wimberly v. State*, No. 03-03-00726-CR, 2005 WL 2573524 (Tex. App.—Austin 2005, pet. ref'd) (mem. op., not designated for publication).

[5] *See* note 1, *supra*.

[6] We note that, in order to prevail on an actual innocence claim, an applicant must prove that the evidence on which he relies was not known to him at the time of trial (*Ex parte Mayhugh*, 512

the affidavit of Tones dated February 13, 2014 (and sworn to before a Notary Public on

March 3, 2014). In his affidavit, Tones states as follows:

- He is "presently incarcerated" at the McConnell Unit in Bee County.

- Tones is alone responsible for the "agravated robbery" [*sic*] committed on December 23, 2002 at a Pizza Hut located on Rancier Avenue in Killeen, Texas, between the hours of 7:30 p.m. and 9:30 p.m.

- This robbery was one of a series of other aggravated robberies he committed in Killeen.

- He "gain[ed] forceable [*sic*] entry through the back door of the Pizza Hut when a white male, delivery guy, had returned to the store."

- Tones then "forced an Hispanic male, another employee, to lead [him] to the store's safe."

- He came in contact with a Hispanic female who appeared to be the manager of the store, and she handed him the money from the safe.

- After obtaining the money from the safe, Tones fled the scene through the back door, crossed the field behind the Pizza Hut, and entered a nearby apartment complex where he had parked his car.

---

S.W.3d 285, 295 (Tex. Crim. App. 2016) (plurality)), or at the time he filed any previous writ applications (TEX. R. CRIM. PROC. art. 11.07, § 4(a)(1)). *See also Ex parte Brown*, 205 S.W.3d 538, 545–46 (Tex. Crim. App. 2006). The State has claimed, and the trial court has found in the alternative, that Applicant was aware of Tones's purported confession to this offense at the time he filed his fourth writ application, yet no mention was made of it by Applicant in his previous writ application. Consequently, said the trial court, Applicant's claim of actual innocence should be dismissed as a subsequent writ. However, Applicant did not acquire Tones's written affidavit until 2014. We find that the extent of Applicant's awareness of, and ability to act on, the newly discovered evidence prior to receiving Tones's affidavit is uncertain and unclear. Therefore, we will dispose of this writ based on the merits of Applicant's claim without addressing whether Applicant was able to raise this claim in a prior writ application.

- Since he has been at the McConnell Unit, Tones met Applicant, who he learned was convicted for this offense.

- Tones is confessing to the crime to clear his conscience, and he is willing to testify concerning this matter.

On March 4, 2015, this Court ordered the trial court to appoint Applicant writ counsel, conduct a live evidentiary hearing where the confessing person should be called to testify, and make findings as to the credibility of the confessing person and any other findings of fact necessary to the disposition of this writ application.[7]

By order dated May 25, 2016, this Court filed and set Applicant's case and requested that the parties brief the following issues:

(1)    Is the newly confessing party's, Tones's, affidavit consistent with his testimony at the habeas hearing and any prior statements Tones has made regarding any of his convictions?

(2)    Is Tones's confession consistent with the testimony from witnesses to the robbery who testified at Applicant's original trial?

(3)    Do the original eyewitnesses's descriptions of the robber match Applicant's description, Tones's description, or both?[8]

---

[7] *Ex parte Wimberly*, No. WR-64,017-05, 2015 WL 1015109 (Tex. Crim. App. Mar. 4, 2015) (not designated for publication).

[8] *Ex parte Wimberly*, No. WR-64,017-05 (Tex. Crim. App. May 25, 2016) (per curiam).

## THE EVIDENTIARY WRIT HEARING

**A.**     **Royry Glenn Tones**

On July 9, 2015, the trial court held an evidentiary hearing. Applicant's first witness was Tones. After being admonished of his Fifth Amendment rights, he agreed to waive those rights and testify. Tones testified as follows:

- He is incarcerated for two aggravated robberies he committed on March 3, 2003, in Killeen, Texas. One was at a Pizza Hut and one was at a Subway sandwich shop. Tones is serving two seventy-five year sentences.

- Tones admitted that he committed a string of 12 to 15 aggravated robberies in that area between December 23, 2002 and March 3, 2003.

- Tones said that, at that time he was 35 years old. He is 5' 9" tall, and weighed 182 pounds at that time.

- He claimed that he was the "sole perpetrator" of the robbery of the Pizza Hut on Rancier Avenue in Killeen on December 23, 2002.

- Tones said that he committed that robbery "somewhere between like 8:00 and 9:00 o'clock in the evening. Maybe 7:00. I know it was like getting towards dusk in the evening."

- During that robbery Tones recalls that he was wearing "a ski mask [], a black beanie cap, a black bomber jacket, and red lucky gloves."

- He said he used as a weapon an "870 Remington," which is a "sawed-off shotgun."

- Tones said that he "entered the restaurant through the back door, a guy was pulling up, a delivery guy and [he] forced [his] way in through the back door while he was driving in."

- He testified that he had one person lead him to the safe, and when he got to the safe, "there was a lady. She had dark hair. She was already at the cash register. The safe is right below the cash register and [he] demanded the money from her and she was

the one that gave it to [him]."

- Tones said he ran out the back door.

- Tones said that Applicant had no involvement in the robbery at the Pizza Hut on Rancier on December 23, 2002.

- Tones also testified that he had no involvement with Applicant while both were at the Bell County Jail awaiting their trials. He said he did not know him then. Tones said he has never seen the offense report or witness statements for the offense for which Applicant was convicted.

- Tones said that he learned some time in 2008 or 2009 from another inmate at the McConnell Unit that Applicant had been charged with the December 23, 2002, Pizza Hut robbery.

- Tones said that after he learned that, he contacted "several attorneys in order to try to rectify the situation" and "help Mr. Wimberly." He testified that he did this because, since he's been in prison, he has become a Muslim, and the Koran teaches that "we must do the right thing in order to reach heaven."

- Tones finally executed an affidavit in 2014 confessing to the December 23rd robbery, and he gave the affidavit to Applicant "for him to do whatever he needed to do with it."

- Tones did not give a clear explanation why it took from 2009 to 2014 to execute the affidavit.

- Tones did not have a satisfactory explanation for why his affidavit confessed to committing several other robberies, but when filing for post-conviction relief in connection with the other robberies for which he was convicted, he seemingly took an inconsistent position. And yet, at the evidentiary hearing, he said that he did commit the robberies, but just felt that he received "too much time."

**B.      Applicant, Christopher Eugene Wimberly**

Applicant did not testify at his trial.  He did, however, testify at the evidentiary writ

hearing:

•        At the time he was arrested for the Pizza Hut robbery, Applicant was already in
         custody in Bell County Jail, suspected of committing another robbery (the "Hallmark
         Restaurant robbery").

•        The Pizza Hut robbery occurred in December, 2002, and the Hallmark Restaurant
         robbery occurred in January, 2003.  In this hearing Applicant admitted to driving the
         getaway car for the Hallmark Restaurant robbery.

•        Applicant testified that the State dismissed the Hallmark Restaurant case after he was
         sentenced to 50 years in this case.

•        Applicant testified that, at the time he was arrested for the Pizza Hut robbery, he was
         35 years old and weighed "probably about 190" lbs.  He said he weighed about 260
         lbs at the time of the writ hearing.  Applicant also said that he is 6' 3" tall.

•        At the end of 2008, early 2009, Applicant learned by word of mouth from another
         inmate—a prison writ writer named "Lavert Robinson"—that a fellow inmate named
         Tones might be responsible for the Pizza Hut robbery.  But, he did not know Tones,
         and he relied on Robinson to help him get in touch with Tones to see if he would be
         willing to confess to the crime.

•        Applicant said that Robinson got in touch with Tones and said that Tones would be
         willing to help, so Applicant said he wrote to several lawyers to get help.  Applicant
         said no one was willing to help him.

•        Tones gave Applicant his handwritten affidavit in February of 2014, and he gave him
         a signed typewritten affidavit in March of 2014.

•        Applicant testified that he had no avenue to help him prove his innocence until he
         obtained Tones's affidavit.

•        Applicant testified that he never showed Tones the offense report or witness
         statements for the December 23rd Pizza Hut robbery.

## C.    Deputy Charles D. Cox

Another witness to testify at the writ hearing was Charles D. Cox, Chief Deputy of the Bell County Sheriff's Department. Deputy Cox testified that both Applicant and Tones were in custody in the Bell County Jail on Central Avenue, in downtown Belton, in 2003 and 2004. Specifically, Tones was in jail from March 5, 2003 to June 16, 2004, and Applicant was in the same jail from January 8, 2003 to January 7, 2004, and from February 25, 2004 to March 17, 2004. Thus, Tones and Applicant were in the same jail at the same time for approximately eleven months—from March of 2003 to January of 2004, and again from February of 2004 to March of 2004.

Deputy Cox confirmed that, although Tones and Applicant were not housed in the same housing area, they could have interacted at the infirmary, or during outdoor recreation, religious type events or functions, or adult education functions.

## D.    Detective Karl Ortiz

Detective Karl Ortiz is a criminal investigator with the Bell County District Attorney's Office in Belton, Texas. At the time of the Pizza Hut robbery, Detective Ortiz was working as a police officer for the Killeen Police Department. Detective Ortiz testified that they received a Crimestoppers tip that identified Applicant (aka "Black") as the one responsible for the Pizza Hut robbery. He had already shown Mr. Gioioso and Philip Wynn photo line-ups with other suspects, and neither was able to identify anyone as the perpetrator of the

Pizza Hut robbery until Detective Ortiz presented them a photo line-up with Applicant's picture in it.

Detective Ortiz also explained that the witnesses in the Pizza Hut robbery identified a 12-gauge pump shotgun, which is a "full length shotgun," as the weapon used by the robber in the Pizza Hut robbery. He then identified a different 12 gauge pump shotgun with a "pistol grip" that was used by Tones and his then partner, Edward Montgomery, in their robberies. Detective Ortiz said that none of the witnesses to the Pizza Hut robbery identified a "pistol grip" pump shotgun. Detective Ortiz also said that, because they never recovered the shotgun from the Pizza Hut robbery, the "exemplar" they used at trial could have differed slightly in barrel length from the shotgun used by the robber and seen by the witnesses. This explains why Mr. Gioioso's description of the gun as a short barrel shotgun could still have been consistent with Mr. Wynn's description of the shotgun, and why it was significant that none of the Pizza Hut witnesses described the "pistol grip," which was the shotgun used by Tones and Montgomery in their robberies. All of the witness statements to the Pizza Hut robbery identified the weapon as either "a shotgun" or a "pump action shotgun."

E.     **Other Witnesses at the Evidentiary Hearing**

Gerard Gioioso and David Sawchak testified at the writ hearing. Both were present the night of the Pizza Hut robbery. Mr. Gioioso testified at the trial, but Mr. Sawchak did not. Mr. Gioioso stated that, because his memory has faded, he could not add anything new to his trial testimony. Mr. Sawchak testified at the writ hearing that the robber's weapon was

a short barrel shotgun with a pistol grip, and he identified Tones's picture, with 50% certainty, and not Applicant's, as the person who he remembered committed the robbery. The trial court found that Mr. Sawchak's vantage point of the robber and his weapon was not as close as that of either Mr. Gioioso or Mr. Wynn. In fact, Mr. Sawchak agreed that Mr. Wynn probably had a better view of the robber.

## ANALYSIS

### A.    The Burden of Proof in Actual Innocence Claims

The claim of "actual innocence" being asserted by Applicant is a *Herrera*-type[9] claim—"a substantive claim in which the person asserts a bare claim of innocence based solely on newly discovered evidence."[10] We have held that, "to succeed in an actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence."[11] To determine whether an applicant has met this standard, the habeas court must "examine the new evidence in light of the evidence

---

[9] *Herrera v. Collins*, 506 U.S. 390 (1993).

[10] *Ex parte Mayhugh*, 512 S.W.3d at 295 (first citing *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996); and then citing *Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006)).

[11] *Id*. (first citing *Brown*, 205 S.W.3d at 545; and then citing *Ex parte Tuley*, 109 S.W.3d 388, 392 (Tex. Crim. App. 2002)).

presented at trial."[12]

On post-conviction review of an application for writ of habeas corpus, the trial judge conducting the writ hearing is in the best position to assess the credibility of the testifying witnesses.[13] Therefore, we generally defer to the habeas court's findings of fact, particularly those related to credibility and demeanor, when those findings are supported by the record.[14] We then apply a *de novo* standard of review to the legal question, "Does the applicant's new evidence, viewed in the light most favorable to the habeas court's factual findings and credibility determinations, actually prove, by clear and convincing evidence, that a jury would acquit him?"[15]

Establishing actual innocence "is a 'Herculean task' because, once an applicant 'has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears,' and 'in the eyes of the law, [the applicant] does not come before the Court as one who is "innocent," but . . . as one who has been convicted by

---

[12] *Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014) (citing *Ex parte Thompson*, 153 S.W.3d 416, 417 (Tex. Crim. App. 2005)).

[13] *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (explaining that, for over forty years of Texas writ jurisprudence for habeas corpus proceedings, this Court has been the ultimate factfinder, and the trial judge has been the "original factfinder").

[14] *Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014); *Reed*, 271 S.W.3d at 727 (holding that the trial judge on habeas is the "original fact-finder" because the trial judge is in the best position to assess the credibility of witnesses).

[15] *Ex parte Mayhugh*, 512 S.W.3d at 296 (citing *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)).

due process of law. . . .'"[16] After our independent review of the record, which includes trial and habeas hearing transcripts, we defer to the trial court's finding that the new evidence is not credible because such finding is supported by the record. For the reasons discussed below, we hold that Applicant has not satisfied his "Herculean" burden to unquestionably establish his actual innocence by clear and convincing evidence.

**B.  Inconsistencies in Tones's Version of Events**

Tones stated in his affidavit, which was attached to Applicant's writ application, that he committed a series of robberies of fast food restaurants in Killeen back in late 2002 to early 2003, and that he, alone, committed the robbery of the Pizza Hut on December 23, 2002. However, in another affidavit that he attached to his own writ application pertaining to his own robbery conviction, Tones stated that he would have told the jury in *his* trial that he did not help commit any robberies. Tones appeared to be denying culpability in any robberies, yet in the affidavit he gave to Applicant, Tones confessed to committing the Pizza Hut robbery and several other robberies. The trial court found "that Tones's prior affidavits when juxtaposed against his recent affidavit, which the Applicant terms a confession is, at the very least, confusing, contradictory, and unpersuasive." We conclude that the record supports this finding.

---

[16] *Ex parte Harleston*, 431 S.W.3d 67, 70 (Tex. Crim. App. 2014) (citing *Herrera*, 506 U.S. at 399–400).

**C.** **The Inconsistencies Between Tones's Confession and the Eyewitness Trial Testimony**

The testimony of a single eyewitness can be sufficient to support a felony conviction.[17] "Reconciliation of conflicts and contradictions in the evidence is within the province of the jury, and such conflicts will not call for reversal if there is enough credible testimony to support the conviction."[18]

Looking at the trial testimony, two witnesses identified Applicant as the one who committed the Pizza Hut robbery. In a photo line up, Philip Wynn said he was 100 percent certain, and Mr. Gioioso said he was 80 percent certain, that Applicant was the robber. They both identified Applicant in court as the robber. Tones and Applicant are both black males, the same age, with mustaches and facial hair. Yet, they differ by six inches in height. Tones testified that he is 5'9" tall. Applicant testified that he is 6'3" tall. The two eyewitnesses at trial described the robber as about 6 feet tall—right in the middle of the two heights. A third witness described the robber as 6'1," and a fourth described him as 5'7" to 5'9." Yet, both Mr. Gioioso and Mr. Wynn described the robber as being taller than 5'9." Only Mr. Sawchak believed that the robber was shorter than 5'9." At the time of the robbery,

---

[17] *Aguilar v. State*, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) ("We conclude that the testimony of the eye witness alone was sufficient to support the jury's verdict.") (citing *Lopez v. State*, 356 S.W.2d 674, 676 (Tex. Crim. App. 1962)); *see also Lopez* 356 S.W.2d at 676 (Tex. Crim. App. 1962) ("The jury are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. They were authorized to accept or reject any or all of the testimony of the appellant.").

[18] *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982).

Applicant was a larger man than Tones, and all of the witness testimony described the robber as being larger than Philip Wynn, who was 5'9" and 175 lbs, roughly the same size as Tones. The record supports the trial court's finding that Mr. Sawchak's testimony at the writ hearing in 2015 was not as credible as the trial testimony of Mr. Wynn and Mr. Gioioso in 2003.

The trial court also pointed out other inconsistencies between Tones's writ hearing testimony and the witness testimony at Applicant's trial. First, Tones testified at the writ hearing that, during the Pizza Hut robbery, he wore a ski mask, a black beanie cap, a black bomber jacket, and "red lucky gloves." However, the witnesses to the Pizza Hut robbery testified that the robber wore a heavy coat with a hood that was pulled tight around the robber's face with a drawstring. None of the witnesses mentioned a ski mask, a black beanie cap, a bomber jacket, or red gloves.

In addition, the trial court found that the testimony at Applicant's trial related to the pump action shotgun used by the robber differs from Tones's testimony that he used a pistol grip shotgun for the Pizza Hut robbery. The trial court did not find Mr. Sawchak's writ testimony describing the robber's sawed-off, pistol grip shotgun persuasive in light of the other, more reliable trial testimony. The record supports this finding. We also defer to the trial court's finding, because the record supports it, that both Detective Ortiz and Deputy Cox were credible witnesses.

Tones said that he forced his way in the back door of the Pizza Hut between 8:00 and 9:00 at night, or possibly earlier (just after dusk), and after the delivery driver was driving

in and pulled up in his car. However, the witnesses to the Pizza Hut robbery testified that the robbery occurred just before 11:00 p.m. when Mr. Wynn (the delivery driver) was leaving to go deliver pizzas, not returning from a delivery.

The trial court concluded that, "Because Tones's recollection of the details of the December 2002 Pizza Hut robbery, which he confesses to committing, is at odds with that of the witnesses who were present and testified at the Applicant's trial, and because his confession contradicts his previous statement to the trial court, the court finds his confession and his testimony unpersuasive." This finding is supported by the record. The trial court found that the new evidence—the affidavit/confession of Royry Glenn Tones—is unpersuasive and not credible. The trial court concluded that, when weighed against the evidence of Applicant's guilt, the new evidence is insufficient to meet his actual innocence burden of proof.[19] This conclusion is supported by the record.[20]

---

[19] *Tuley*, 109 S.W.3d at 390.

[20] In addition, we find that other facts brought out during the writ hearing weigh against Applicant's claim of actual innocence. Mr. Gioioso testified at the evidentiary hearing that the Pizza Hut was robbed several times during a short period of time, but he did not recall being present at the other robberies. It is entirely possible that both Applicant and Tones robbed the Pizza Hut on Rancier Avenue on different dates, and Tones simply got the date wrong when confessing to the crime. Moreover, both Tones and Applicant said they had never met, yet both men were in Bell County Jail at the same time for a period of almost one year from 2003 to 2004. The trial court found that "it was unclear whether Tones's confession was an act of genuine contrition or the theory of a prison writ writer brought to life." While this finding may not have direct support in the record, there is nothing in the record to contradict this observation by the trial court. In addition, Tones's affidavit was executed twelve years after the Pizza Hut robbery occurred. Tones risks no negative penal consequences for confessing to this robbery because the statute of limitations, which is five years, has long since passed. *See* TEX. CODE CRIM. PROC. art. 12.01(4)(a). This fact lessens the credibility of Tones's confession. *See Ex parte Navarijo*, 433 S.W.3d 558, 567 (Tex. Crim. App. 2014) (noting that this Court is the "ultimate fact-finder" ).

## CONCLUSION

To summarize, the trial court found, and we observe that (1) Tones's affidavit is not entirely consistent with his testimony at the habeas hearing and any prior statements he has made regarding his convictions; (2) Tones's confession is not consistent with the testimony from witnesses to the robbery who testified at Applicant's original trial; and (3) the original eyewitness testimony at trial describing the robber more closely matches Applicant's description than Tones's. Based on these findings, which are supported by the record, we hold that Applicant has not shown by clear and convincing evidence, that, had the jurors heard Tones's confession to the crime, they would have found Applicant not guilty.

To prevail on his claim of actual innocence, Applicant must demonstrate by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence.[21] He bears the burden of showing that the newly discovered evidence unquestionably establishes his innocence.[22] We conclude that Applicant has failed to meet this burden. Relief is denied.

DELIVERED:          November 1, 2017

DO NOT PUBLISH

---

[21] *Mayhugh*, 512 S.W.3d at 295 (citing *Brown*, 205 S.W.3d at 545); *Tuley*, 109 S.W.3d at 392.

[22] *Elizondo*, 947 S.W.2d at 209.