

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-86,381-01

## EX PARTE ARMANDO RUBIO, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 97-CR-1286-C IN THE 94TH DISTRICT COURT
### FROM NUECES COUNTY

ALCALA, J., delivered the opinion for a unanimous Court.

## O P I N I O N

Armando Rubio, applicant, was convicted of three counts of aggravated sexual assault of one of his daughters, hereinafter referred to as "complainant." Because the complainant has recanted her allegations that applicant sexually assaulted her, applicant now seeks post-conviction habeas relief from these convictions on the theory that this recantation is new evidence that demonstrates his actual innocence. After conducting a live hearing on applicant's actual-innocence claim, the habeas court recommended that this Court grant relief. The habeas court made findings of fact and conclusions of law that applicant had

established by clear and convincing evidence that, given the complainant's recantation, no reasonable juror would have convicted him. We disagree. Although the complainant's recent recantation is more decisive, the jury that convicted applicant knew about a prior pretrial recantation by the complainant when it convicted applicant, and thus the instant recantation is not clear and convincing evidence that would have swayed a juror's determination as to applicant's guilt. Furthermore, when viewed in light of her inconsistent statements over the course of twenty years with respect to whether applicant sexually abused her, the complainant's new recantation merely muddies the waters, but it does not rise to the level of showing by clear and convincing evidence that it would have affected the outcome of the proceedings. We conclude that this new recantation fails to establish by clear and convincing evidence that no reasonable juror would have found applicant guilty of sexually assaulting the complainant. Accordingly, we deny relief.

## I. Background

The background of this case is lengthy, as it includes the pretrial investigation, guilt testimony from the retrial at which applicant was convicted, punishment evidence from that retrial, a motion for new trial hearing, the habeas hearing, and the trial court's findings of fact and conclusions of law.

### A. The Pretrial Investigation

Applicant is the father of five daughters: A.M.T., A.A.P., complainant, A.L.L, and

D.L.R., listed in order from oldest to youngest.[1] In January 1997, D.L.R., who was five years old at the time, asked her maternal grandmother, Dora Ann Curiel, if it was "nasty" for someone to touch her legs. Curiel and A.M.T., applicant's oldest daughter who was seventeen years old, interpreted this question as an outcry of abuse. D.L.R. was taken to a hospital and a SANE examination was conducted that revealed evidence of sexual assault. The following day, two of D.L.R.'s sisters, the complainant and A.L.L, who were nine and seven years old respectively, were examined, and evidence of sexual abuse was discovered in both girls. The complainant and D.L.R. each indicated to hospital staff during their medical examinations that their father, applicant, had sexually abused them. In separate interviews with Child Protective Services, the children indicated sexual abuse by applicant. The case was forwarded to law enforcement, and charges were brought against applicant.

In 2001, applicant was tried for six felony counts: one count of indecency with a child against D.L.R., three counts of aggravated sexual assault against the complainant, and two counts of aggravated sexual assault against A.L.L. The case ended in a mistrial after a hung jury.[2] In 2003, applicant was retried for four counts: one count of indecency with a child

---

[1] Because they were minors at the time the offenses were committed, we refer to applicant's daughters by their initials or their birth order in this opinion. *See* TEX. R. APP. P. 9.10(a)(3).

[2] Although the record on habeas mentions testimony and evidence presented at applicant's first trial in 2001, the record and transcripts of that trial were not provided to this Court with the habeas record, and we have been unable to obtain them from the trial court.

against D.L.R. and three counts of aggravated sexual assault against the complainant.[3]

Applicant was convicted on all four counts. The jury sentenced him to ten years'

imprisonment for indecency with a child and thirty years' imprisonment for each count of

aggravated sexual assault, with all sentences to run consecutively. Applicant's convictions

were upheld on appeal. *See Rubio v. State*, No. 13-03-426-CR, 2004 WL 1698321, at *1

(Tex. App.—Corpus Christi July 29, 2004) (mem. op., not designated for publication).[4]

## B. Evidence at Applicant's Guilt Retrial

Because actual-innocence claims based on new evidence must be considered in light

of the totality of evidence that was before the jury, resolving these claims necessarily requires

---

[3] The second indictment stated as follows:

Count 1: Armando Rubio, Defendant, on or about December 20, 1996 in Nueces County, Texas, did then and there, with intent to arouse and gratify sexual desire, intentionally and knowingly touch the genitals of another person, namely, [D.L.R.], and that [D.L.R.] was then a female child younger than 17 years of age and not the spouse of the Defendant. *See* Tex. Penal Code § 21.11.

Counts 2 to 4: Armando Rubio, Defendant, on or about [August 15, September 15, and December 15, 1996] in Nueces County, Texas, did then and there, by inserting his finger, intentionally and knowingly cause the penetration of the sexual organ of [complainant], a female child younger than 14 years of age and not the spouse of the Defendant. *See* Tex. Penal Code § 22.021.

[4] On appeal, applicant complained of ineffective assistance of counsel due to trial counsel's failure to: "(1) meet with him prior to trial with sufficient time to prepare a defense; (2) interview potential witnesses; (3) properly cross-examine the victims; and (4) pursue a defense." *Rubio v. State*, No. 13-03-426-CR, 2004 WL 1698321, at *1 (Tex. App.—Corpus Christi July 29, 2004) (mem. op., not designated for publication). The court of appeals found that applicant's claims regarding trial counsel's failure to prepare a defense and interview potential witnesses were dependent upon testimony received at an untimely motion-for-new-trial hearing and, thus, could not be considered on appeal. *Id.* at *2. The court of appeals was unpersuaded by applicant's claims concerning trial counsel's failure to communicate with applicant and properly cross-examine witnesses, and it affirmed his convictions. *Id.* at *2-3.

examining the evidence and testimony presented at applicant's 2003 retrial. Accordingly, we summarize below the State's case, which consisted of testimony from Orlando Benavidez, Dora Ann Curiel, Teresa Garcia, D.L.R., complainant, and the SANE reports of D.L.R. and complainant, as well as the defense's case, which consisted of testimony from Dr. Marshal Voris.

### 1. The State's Case

#### a. Orlando Benavidez

Orlando Benavidez was an investigator for the Nueces County Sheriff's Department. Benavidez testified that he became involved in applicant's case after receiving an investigative report from Child Protective Services that three of applicant's daughters, D.L.R., A.L.L., and complainant, had been sexually assaulted. According to the report, an outcry had been made by D.L.R. to her grandmother; the three girls had been examined at Driscoll Children's Hospital and each had physical indications of sexual trauma. D.L.R. and complainant had made outcries to the examining nurse accusing applicant of abuse. The CPS report named three alleged perpetrators of the sexual assaults: applicant, Vicente Cano, and Johnny Molina. Benavidez contacted the men and each of them denied any wrongdoing. Benavidez also interviewed Dora Ann Curiel, the girls' maternal grandmother, and A.M.T., the girls' eldest sister, but did not interview the three minor daughters. Given the corroborating medical evidence and interviews by Child Protective Services, Benavidez forwarded the case to prosecutors.

**b. Dora Ann Curiel**

Dora Ann Curiel testified that, in January 1997, she was caring for complainant, A.L.L., and D.L.R. while their mother, Norma Pena, sought treatment for drug addiction. During that time, D.L.R. approached her and asked, "Grandma, it's nasty if somebody touch your legs?" After Curiel asked who was touching her, D.L.R. answered, "my dad." Curiel noted that applicant had routinely changed diapers, bathed, and dressed all the children since they were infants, and so she did not immediately suspect molestation. However, she relayed the exchange to A.M.T., and together they took D.L.R. to be medically examined for sexual assault. After learning that D.L.R. had physical indications of sexual abuse, Curiel and A.M.T. brought complainant and A.L.L. to be examined. Curiel stated that she had little involvement after that point and did not ask A.M.T. or the girls any further questions about the possible abuse. On cross-examination, Curiel acknowledged that D.L.R. said that Johnny Molina and Vicente Cano, friends of applicant, had also touched her when they babysat her.

Curiel lastly testified that she called Child Protective Services numerous times before she started caring for the girls in 1997. She stated that applicant "never was there" and that applicant's residence often had "certain men coming in and out like drug addicts."

**c. Teresa Garcia**

Teresa Garcia worked for Child Protective Services and, in January 1997, was assigned to investigate reports of negligent supervision of the Rubio children due to their

parents' drug abuse.[5] Due to the negligent supervision, complainant, A.L.L. and D.L.R. had been placed with Curiel. While investigating the negligent supervision complaint, Garcia received a report that D.L.R. had made an outcry of sexual abuse to Curiel. Garcia noted this is not unusual because "[o]nce a child is placed in with a relative, you'll find that they feel a little bit more safer of their surroundings and so they become a little bit more open about what's going on in their home." Garcia noted that following the outcry, complainant, A.L.L., and D.L.R. each had positive medical indications of sexual assault: complainant and A.L.L. showed signs of vaginal trauma, and D.L.R. showed signs of vaginal and anal trauma.

After the medical examinations, Garcia interviewed the children separately at the Children's Advocacy Center. Garcia testified that, during complainant's interview, "[complainant] had indicated that she thought it was [applicant] but was not sure." Garcia indicated that the complainant stated applicant had touched her but then wavered in her assertion. According to Garcia, "[Complainant] had indicated that she thought her father had touched her but that she didn't know. She acted confused and ashamed and really kind of —at that point she kind of brought herself into—herself not really wanting to disclose which is not uncommon of an initial outcry." Garcia described complainant's hesitation to discuss her earlier accusation as a recantation:

---

[5]     Garcia testified, "The report had indicated that the children [complainant, A.L.L., and D.L.R.] were running around at all hours of the night unsupervised, that they were asking neighbors for food and there was no food in the home, and that there was no adult supervision in the home, and the parents were drug users. And this was the reason that the children were being neglected was because of the parents' drug use."

[State]:     So you're saying at first [complainant] said that [applicant] did something to her but later recanted and said that—

[Garcia]:    Yes

[State]:     —he didn't?

[Garcia]:    Exactly. When I asked specifically what happened, [complainant] kind of like didn't want to talk about it and so she just said, "I don't know," which is not uncommon for somebody who has gone through a situation, a traumatic situation like that.

Garcia testified that she interviewed D.L.R. twice. During the first interview, D.L.R. "made an outcry that she had been touched by [applicant], her father, in her vaginal area." After that interview, Garcia learned from Curiel that D.L.R. had made a second outcry by telling her "something about Johnny Molina and [Vicente] Cano touching her in her private parts" while lying on a bed and opening her legs. When Curiel asked D.L.R. what she was doing, D.L.R. replied, "Well, this is what my daddy makes me do. He makes me open my legs."

Garcia interviewed D.L.R. a second time after receiving the information from Curiel. D.L.R. indicated that applicant had penetrated her vagina and anus with both his fingers and penis, as had Vicente Cano and Johnny Molina, on multiple occasions. Garcia testified that D.L.R. recalled two specific incidents of abuse. D.L.R. stated that in the first incident, applicant entered her bedroom late at night, woke her, undressed himself, removed her underwear, and penetrated her vagina and anus. D.L.R. stated that in the second incident, Johnny Molina and Vicente Cano were fondling her vaginal area over her clothes while

applicant watched and that Molina and Cano had also vaginally and anally penetrated her with a stick.

On cross-examination, the defense challenged Garcia's interview methodology as improperly leading the children to indicate that applicant had sexually abused them. Garcia testified that, at times, it is necessary to ask questions a certain way because children will withdraw or lose focus. However, Garcia denied that she sought to elicit particular responses, and she stated that her questions were instead aimed at confirming and expanding upon statements the children had previously made during their SANE examinations. Defense counsel also asked Garcia if she had questioned the children about Molina or Cano. Garcia testified that she did and "once the children indicated to me that these were some of the people that had victimized them, I did get a little bit more information from them in reference to who they were, why they were there, what they were doing."

**d. D.L.R.**

D.L.R. was eleven years old by the time of applicant's retrial in 2003. At that trial, she testified regarding the claims of abuse that occurred when she was four years old. She testified that she remembered telling her grandmother that applicant touched her vagina with his hands on more than one occasion but could not remember where it occurred, if the touch was over or beneath her clothing, or if applicant said anything during the incidents. She testified that it made her feel ugly and that she did not like being touched in that way. She could not remember if anyone else had touched her private areas. D.L.R. testified that she

remembered going to the hospital and being examined and speaking with the SANE nurse and Teresa Garcia.

### e. Complainant

Complainant was sixteen years old when she testified at applicant's retrial in 2003 regarding the claims of abuse that occurred when she was nine years old. She testified that she remembered going to "Driscoll Children's Hospital to get checked because we told – we said the truth and we said that we got touched by our dad and the nurse checked us to see[.]" She also recalled speaking with a CPS worker at the Children's Advocacy Center and discussing the abuse. She testified on direct examination that applicant had sexually assaulted her:

[State]:          Tell—tell us if anyone ever touched you on any of your private parts?

[Complainant]:    Yes, they have.

[State]:          Okay.  And when did that happen?

[Complainant]:    When I was small.  I was a little kid.

* * *

[State]:          Who touched you on your private parts?

[Complainant]:    My so-called dad.

* * *

[State]:          Okay. Which private part were you touched on?

[Complainant]:    My vagina.

[State]:  All right. Would you tell us how—what part of your dad's body touched your vagina?

[Complainant]:  His hands and his fingers.

[State]:  What—what would he do when he touched you there?

[Complainant]:  He would put—he would go and he [would] put his fingers in me.

[State]:  Where would you be when this happened?

[Complainant]:  In the shower or in bed.

[State]:  How many times did this happen in the shower?

[Complainant]:  In the shower, many times.

[State]:  How many times did this happen in the bed?

[Complainant]:  Many times as well.

* * *

[State]:  Did it ever happen after you went to Driscoll Children's Hospital and had the SANE exam?

[Complainant]:  No.

[State]:  So it happened before that?

[Complainant]:  Yes.

[State]:  Did it happen when you were living [with applicant]?

[Complainant]:  Yes.

[State]:  Did anyone else touch you in any of your privates?

[Complainant]:  No.

[State]:            Did [applicant] say anything while he was touching you?

[Complainant]:      No.

[State]:            When he was touching you in the shower, did you have any clothes on?

[Complainant]:      No.

[State]:            When he was touching you in the bed, did you have any clothes on?

[Complainant]:      No.

[State]:            Do you know if he had any clothes on when he touched you?

[Complainant]:      He had his boxers.

[State]:            How did it make you feel when he touched you?

[Complainant]:      Like I was trash, like I was nobody.  I was nobody to him.

[State]:            [W]hen [applicant] would touch your vagina you said that he would put his fingers inside of your body; is that correct?

[Complainant]:      Yes.

[State]:            Do you remember saying anything to [applicant] when this was happening?

[Complainant]:      No, because I was scared.

[State]:            Did you want him to stop touching you?

[Complainant]:      Yes, but I was scared.  I was a little kid.  I didn't know what to do.

The State questioned complainant about her statements during the interview with Child Protective Services.  The State asked, "I believe that during that interview you—at one point you said, 'I don't remember if anybody touched me,' and then you said 'nobody

touched me.' Do you remember that?" Complainant explained that she said that "because I didn't even know who [the interviewer] was and I was embarrassed. I was ashamed that happened to me." The State asked if it was her testimony at trial that applicant had touched her sexually. Complainant answered yes.

On cross-examination, the defense asked complainant if she recalled Child Protective Services coming to meet with her and her parents. Complainant answered that they "would come all the time," "[l]ike every month but that she did not speak with them. The defense asked, "And you testified earlier that when you met with the CPS worker Mrs. Garcia, that you told her that nothing had happened at one time, correct?" Complainant answered, "Yes."

### f. Medical Evidence

The SANE reports for D.L.R. and complainant were admitted as State's exhibits during applicant's retrial. The annotations made on each report are described below.

### i. D.L.R.

D.L.R.'s SANE examination report form detailed the physical indications of sexual abuse as well as a handwritten statement of notes concerning the SANE examination. Under "Sexual Assault Examination Record (History)," it states, "[Patient] states 'Cano touched me with his hand right here ([patient] touches vaginal area) it happened at my house. My dad touches me there with his hand and a stick' (said when examining rectal area)." Under the "General Appearance" section, D.L.R. was described as "Alert, oriented, very cooperative, good historian." Notations on the report under "Pelvic Examination" state, "Well healed tear

between 5-6 o'clock on hymen" and "narrowing of hymen between 3-6 o'clock" for hymen; "not visualized" for the vagina and cervix; "no trauma noted" for the vulva labia majora or vulva labia minora; "bimanual exam not performed" for uterus and adnexae; and "anal dilation occurred within 5 seconds of both the external and internal sphincters up to 10mm." Under "Sexual Assault Examination Record (Impression)," it states, "History of sexual assault given by patient. Genital trauma demonstrated on physical examination. Lab findings negative." The SANE report includes a section of handwritten notes following the Sexual Assault Examination Record form. The notes include a passage that states, "[D.L.R.] did have genital trauma and rectal trauma (please refer to SANE report) and stated [applicant] and Vincente Cano were perpetrators."

### ii. Complainant

Complainant's SANE examination report form detailed physical indications of sexual abuse. Under "Sexual Assault Examination Record (History)," it states, "[Patient] states 'My dad touched me on my privates.' When asked what he touched her with, [patient] got upset and said she did not want to talk about it." Notations on the report under "Pelvic Examination" state, "Well healed tear between 5-6 o'clock on hymen" and "narrowing of hymen between 7-9 o'clock" for hymen; "not visualized" for the vagina and cervix; "no trauma noted" for the vulva labia majora or vulva labia minora; and "bimanual exam not performed" for uterus and adnexae. The report continued that she had "good sphincter tone no trauma noted" for the anus. Under "Sexual Assault Examination Record (Impression),"

it states, "Sexual assault by history. Genital trauma demonstrated on physical examination."

The SANE report includes a section of handwritten notes with a passage that states, "Theresa

Garcia[,] CPS[,] has been notified that per SANE examiner, Mary Ellen Jones, [complainant]

did have positive outcry concerning father but recanted. Her physical examination reveals

vaginal penetration."

### 2. The Defense Case Consisted of Testimony From A Sole Witness, Dr. Marshal Voris

Dr. Marshal Voris, a psychotherapist and professor of psychology, was the sole

defense witness. Dr. Voris testified that the children's accusations against applicant were

likely biased by improper interviewing techniques for young children due to the susceptibility

of these children in light of the circumstances of their upbringing. Dr. Voris testified that the

personal biases of an interviewer and the form of questions asked by medical staff and

investigators can telegraph and reinforce the desired answers rather than truthful responses.

Dr. Voris testified that children without strong parental support who are raised in less stable,

lower socioeconomic conditions, such as the conditions applicant's daughters grew up in, are

more susceptible to being improperly led by questioning. Additionally, younger children

who have limited vocabulary often cannot convey nuance, such as the difference between

"touch" and "fondle." Consequently, answers to questions asking about being fondled rather

than being touched might convey more meaning to an interviewer than the child intended.

Dr. Voris further discussed the fact that children are still cognitively progressing and have

difficulty separating what is objective reality and what is imagined as part of the

developmental process of making sense of the world. Dr. Voris testified that many of these factors appeared to be present in the complainant's and D.L.R.'s allegations. In this case, Dr. Voris testified that, because the initial outcry was to Curiel, she was functionally the first interviewer who might have communicated a bias against applicant to the girls. Given their young ages at that time, they may have adopted that bias against applicant throughout later questioning. Dr. Voris also testified that, after reviewing the videotaped interviews, he believed the questioning by Child Protective Services was slanted to find that sexual assaults had occurred.

Dr. Voris also discussed the SANE medical reports for complainant and D.L.R. He noted that the "sexual assault history" annotation did not mean there was DNA, semen, venereal disease, or physical trauma. Rather, it meant only that there had been a claim of sexual abuse. Dr. Voris testified that the medical findings showing "narrowing of the hymen" and a "well-healed tear in the hymen" did not conclusively show sexual abuse and such injuries could have been caused by innocent activities such as riding a bike or climbing a tree. Dr. Voris cited a study that concluded that, without DNA, semen, venereal disease, or blunt trauma present, abnormalities to the hymen are not indicative of sexual assault and relying on only hymenal abnormalities to indicate sexual abuse produces a sixty-seven percent false-positive rate. Dr. Voris stated he did not understand the annotations in D.L.R.'s medical reports concerning anal penetration and dilation of the anus and so he could offer no conclusions as to their veracity. Dr. Voris concluded that the medical evidence did not

suggest that any sexual assaults occurred, and he observed that the notes section in complainant's SANE report documented that complainant had recanted her claim of sexual abuse by applicant.

### C. Evidence at Applicant's Retrial Punishment Phase

After applicant was found guilty, the retrial proceeded to the punishment phase, and the State called applicant's four oldest daughters to testify.

### 1. A.A.P.

Applicant's second-oldest daughter, A.A.P., testified that she wished to thank the jury because complainant and D.L.R. had "been through a lot." She testified that D.L.R. could not sleep at nights, required medication and counseling, and was afraid to be around men. She testified that D.L.R. is "not well in the head anymore because of [applicant]" and that "she's not a normal 11-year-old. She can't think right at all." A.A.P. testified the same was true of complainant and that "she can't get close to anybody . . . [s]he's afraid of everybody."

### 2. A.M.T.

Applicant's oldest daughter, A.M.T., testified that the sexual abuse had affected both complainant and D.L.R. Both girls were seeing therapists and taking medication to sleep and to function during the day. She testified that applicant's failures to provide or care for her and her sisters had robbed her of a childhood because she had to be a parent to her sisters. A.M.T. testified that she had done "everything in [her] power to keep [applicant and his family] away from them." However, she stated, "There's not one day that goes by that the

girls don't have a thought of him touching them or killing—wanting to kill themselves, cutting themselves." She similarly thanked the jury for finding applicant guilty "because everybody needs to know what he did to us because nobody believes us." When asked if there was anything else she would like to tell the jury, A.M.T. stated,

> Please imagine being a baby and having drugs and everything all over the place and him French kissing you because he did that to me. My mother told me [] it was okay because he was my father and he could do it. And please put yourself in our shoes because we're five girls and we need you guys to please make everybody see that it was the truth because we lived it, but when nobody sees it, nobody feels it, and they need to know that.

### 3. Complainant

Complainant testified that the abuse had "messed up my whole life . . . I feel like we're nobody. It hurts because people say that we're lying but it's not true because they don't know what happened. We're the one[s] that were there. They weren't." She stated that she missed having a mother and father in her life and that not having parents "kills me inside. It's like I'm nobody." She also thanked the jury. She stated, "I just want to say thank you. I appreciate it. Without you-all, my family's all screwed up. You helped my little sisters and me."

### 4. A.L.L.

A.L.L., applicant's second-youngest daughter, stated that applicant's crimes against her and her sisters had seriously affected her. She testified that she had been diagnosed with bipolar depression. She further testified,

> They say we're liars and stuff, so I mean, why would a four-year-old child

make up such a thing?  I mean, who would—who would do such a horrible thing to a little girl?  It's hurt so much that I can't sleep sometimes.  I take medicines. I mean, it's to the point where sometimes I do think about ending my life because sometimes it's just not worth all the pain that I have to go through and see my sisters go through because of somebody else's mistake.

The State asked A.L.L. whether she had experienced anyone touching her.  She testified that applicant had abused her.  She stated,

My father sexually molested me as well.  My trial's coming up next year, but—hopefully next year.  He touched me on several occasions.  I didn't know it was going on with my other sisters but I knew it was happening with me. He would touch me whenever, I guess he wanted to. And I guess to him, we were just a thing that he owned.

She testified that applicant had touched, but did not penetrate, her vagina with his hands both on top and under her clothes while she was in the shower or in bed or "just whenever."  She stated that she believed that applicant abused her over a period of several years until she was around seven years of age.  A.L.L. testified that she did not make an outcry at the same time as D.L.R. and complainant.  Rather, her outcry occurred to her foster mother sometime shortly after she began living in foster care.

### 5. Edward Rubio

Applicant's brother, Edward Rubio, testified for the defense.  He stated that he had never seen or heard about applicant behaving inappropriately with applicant's or Edward's children.  He testified that applicant's eldest daughter, A.M.T., had grown up hating applicant.  He testified that he did not believe applicant had assaulted his daughters and thought that the evidence did not make sense.

**6. Irma Ortega**

Applicant's sister, Irma Ortega, also testified for the defense. She testified that, despite applicant's drug use, he was a caring father who loved his daughters. Ortega stated that she did not believe applicant had assaulted his daughters. She testified that applicant's oldest daughter, A.M.T., hated applicant and had spread that hatred of applicant to her sisters, which led them to fabricate their claims of abuse.

**7. Applicant**

Applicant testified that he had not sexually abused his daughters. He stated that he was not a perfect father but had cared for his daughters since they were infants, including bathing them, dressing them, cooking for them, and ensuring they went to school. He testified that he believed their grandmother, Curiel, despised him and had either convinced the girls to expressly lie or convinced them to believe a fiction. He also testified that because his daughters were angry with him for being poor and not being a better father, the girls could be coached to falsely accuse him.

**D. Motion for New Trial**

Shortly after his retrial, applicant filed a motion for new trial on the basis of ineffective assistance of counsel. Before the trial court conducted a hearing on applicant's motion, A.L.L. signed an affidavit stating that her testimony during the punishment phase of applicant's retrial was not completely accurate. Applicant then amended his motion for new trial for the court to consider whether false testimony had been presented. The trial court

held a hearing at which A.L.L.'s affidavit was admitted into evidence:[6]

> My name is [A.L.L.], I am 14 yrs. old, my B-day is on 4-18-89. I have dune a lot of thinking from the time that my father has been in jail. So much has happened to get me today. I am currently a run-away. I was living with my older sister [A.M.T.] & her husband [] for 7 yrs. Till about January of 2003 I ran away from all the pressures I had at home. Such as court against my dad and so many other things I was on the run for a month and a half. When I was caught I was placed at Padrie Behavaral for a month and a half from there I was placed at San Antion State Hospital, for a month and a half. I was finally released into the custidy of [A.M.T. and her husband]. When I got home everything seemed to be going fine until one day after summer school. My sisters husband asked me to lay down with him something I had done before and felt comfortable enough to do again. Once I layed down with him I feel asleep only to wake up with him masterbating on myside. I then left the room & procided to tell my sister [complainant]. We then called my older sister [A.A.P.] and told her what had happened I was then kicked out along with my sister [complainant] & [D.L.R.]. We stayed with my sister [A.A.P.] for about a month & then we moved in with my mother who I had not seen in 7 yr's. Scince then life has been hard for me. I've done so much thinking. One day I decide I'd help myself so I left and I am now trying to do whats right. I belive with in thoughs 7 yr's away from my father and mother was taught to hate them. I feel I was told to say many things in court about my father. I feel my sisters hate toward my father has brought us to today. I know my testamony towards my father was not 100% accurate. My father is a good person & he does not deserve this. I was wrong to say things about my father in the manner I did. I feel was so young, and so confused that I went along and said what everyone wanted to hear. In this I will say my father is innocent.

A.L.L. testified at the hearing that she had visited applicant's new-trial-motion counsel on her own accord and had written the above statement without any input from others. She testified that she had run away from A.M.T.'s care, at least in part, because A.M.T. was abusive. However, A.L.L. also testified that A.M.T. had consistently told the

---

[6] Except for the change in the identification of the names, A.L.L.'s affidavit is reproduced verbatim, including original spelling and punctuation.

children to be honest about what had happened to them, and A.L.L. confirmed that A.M.T. never dictated to them what their testimony should be. When asked if she felt pressure from A.M.T. to testify at applicant's retrial, A.L.L. stated, "I felt pressure from my sisters. A lot of it was just guilt that I had for my little sister, the stuff that happened to her." However, later on redirect examination, A.L.L. testified that A.M.T. had gotten upset with her because she did not want to discuss the details of what happened to her with the prosecutor and that A.M.T. told her that she hated applicant.

On cross-examination, A.L.L. testified that she had initially gone to see applicant's former trial counsel because she "felt guilty" about her punishment-phase testimony and wanted to "help her dad." She testified that she "went to [applicant's attorney's] office and we started to talk. He asked me why I was there and I told him cause I felt bad because my dad had to be in jail because what we said and then the sentencing that he got." She stated, that applicant's former counsel told her that she "could help him by writing this paper and by just telling them how I felt and what I thought was—what I believe was true." She testified that applicant's former counsel then directed her to applicant's new-trial counsel's office. When asked about her feelings for applicant, A.L.L. testified, "He's my dad. I mean, I'm always going to love him no matter what." She confirmed that no one had prompted her to make a statement or directed her about what to say in her statement.

After the State and the defense had finished their examinations, the judge conducted his own examination of A.L.L. A pertinent portion of the exchange is detailed below:

[Court]:     You—are you telling this Court that what you told the jury was not true?  Is that what you're telling the Court?

[A.L.L.]:     I'm not saying that things didn't happen because many things did happen but I'm saying everybody messes up.  I mean—

[Court]:     Well, now, okay, there's a difference between "everyone messes up." And you know what the difference between telling the truth and telling a lie is, don't you, young lady?

[A.L.L.]:     Yes, sir.

[Court]:     And you know how important it is to tell the truth?

[A.L.L.]:     Yes, sir.

* * *

[Court]:     Now, my question to you is, which is true, that's what we're here for, to ask this Court to overturn and give [applicant] another trial because what you said at the trial and other things were not true.  Was what you told this jury true about what your father did to you?  And there's no pressure because I want you to look at me and tell me that, that's what this is.  This Court, we're here to seek the truth and find out exactly what happened, and what I understood your testimony to be just a minute ago there were things that happened.  So are you telling me—are you telling me that what you told those men and women sitting over here in this jury box was not true, that your father did not do those things to you?

[A.L.L.]:     He did things but not as extreme as I made them sound.

* * *

[Court]:     So if I understand and these ladies and gentlemen understand what you said at trial was true but you went—you may have carried it a little too far and said things that maybe were exaggerated; is that what you're saying?

[A.L.L.]:     Yes, sir.

[Court]:     But basically what your testimony was it was true what occurred to you?

[A.L.L.]:     Yes, sir.

In discussing the significance of A.L.L.'s affidavit with the State and defense, the trial court found that A.L.L.'s affidavit did not constitute a recantation of her testimony at the punishment phase of applicant's retrial that applicant had sexually assaulted her. Rather, the trial court found that A.L.L. had exaggerated some details of her testimony but was not claiming that she falsely accused applicant. The trial court denied applicant's motion for new trial.

### E. Habeas Application and Hearing

In November 2015, approximately nineteen years after the outcries of sexual abuse and twelve years after applicant's 2003 retrial, the complainant recanted her allegations that applicant had sexually assaulted her. Based on the complainant's recantation, applicant filed an application for a post-conviction writ of habeas corpus asserting that this is new evidence of actual innocence as to his three convictions for aggravated sexual assault of complainant. Applicant is not challenging his conviction for indecency with a child against D.L.R. In his application, applicant contends,

> The only evidence at trial against applicant was the testimony of [complainant] combined with outcry testimony and expert testimony concerning the veracity of child testimony. There was no forensic evidence to show applicant committed the alleged offenses. The lack of any evidence to corroborate [complainant's] testimony creates a situation in which her recantation would make it so no reasonable juror could have found applicant guilty of the offenses of aggravated sexual assault[.]

At the evidentiary hearing on applicant's writ of habeas corpus asserting his actual

innocence, the habeas court heard testimony from complainant, A.A.P., A.L.L., and applicant. However, no evidence was presented from the other witnesses who had testified at applicant's retrial regarding D.L.R.'s and complainant's outcry or the medical evidence. We detail the habeas testimony below.

### 1. The Complainant's Affidavit

In her sworn affidavit, the complainant asserts that she falsely accused applicant at his retrial because her eldest sister, A.M.T., who was twenty-four years old at the time of applicant's retrial, and A.M.T.'s husband, would physically assault her to coerce her to testify falsely against applicant. The complainant also explained that she and her sisters, A.L.L. and D.L.R., were removed from A.M.T.'s custody shortly following applicant's retrial. In her affidavit, complainant states,

> I am [complainant], one of the alleged victims in *State of Texas v. Armando Rubio*, Cause No. 97-CR-1286-C in the 94th Judicial District Court, Nueces County, Texas. I was . . . 16 when I testified at trial in June, 2003, that [applicant] committed sexual acts upon me. I was 9 years old when the conduct was alleged to have happened.
> [Applicant] did not penetrate my female sexual organ with his finger or anything else at any time in 1996. I falsely testified he did so out of fear of my older sister, [A.M.T.], who was 24 and married. My sister [A.L.L.] and I were living with [A.M.T.] and her husband. [A.M.T.] had been appointed managing conservator for me, [A.L.L], and my other sister, [D.L.R.]. [A.M.T.] and her husband would physically assault me and my sister [A.L.L.] when we would refuse to follow her orders to tell adults that [applicant] sexually assaulted us. [A.L.L.] ran away more than once in 2003 before the trial. The day before I testified against [applicant], I witnessed [A.M.T.] beat [A.L.L.] again for refusing to testify.
> I know who [applicant] is, since he is my father, and I lived with him for many years. Many people came into our home when I was a young child.
> [A.L.L.], [D.L.R.], and I were taken from [A.M.T.] and placed in the

custody of the State in 2003.

**2. Complainant's Habeas Testimony**

The complainant testified that she has no present recollection of applicant inappropriately touching her. She testified that she recalled being examined, being undressed with her legs open during the examination, and being questioned about whether applicant had touched her. Complainant recalled telling medical staff during her examination that applicant had not touched her, but remembered being told by medical staff that D.L.R. had alleged that applicant touched her. Complainant testified that she indicated that applicant had assaulted her to conform with D.L.R.'s accusation in hopes of terminating the exam because she felt embarrassed and uncomfortable being undressed and exposed for the examination. She testified, "I wanted to put my clothes back on and leave out the room, like, you know I just said it was my dad so I could put my clothes back on." Complainant further testified that she again alleged applicant had touched her when interviewed by Child Protective Services because that is what she had been told by the medical staff.

Complainant also testified that she was living with A.M.T. and her husband leading up to applicant's trial and that they were abusive towards her. She testified that A.M.T. hated applicant and that she was afraid to say that applicant had not touched her because she witnessed A.M.T. physically beat A.L.L. for saying that applicant had not abused her. Complainant testified that she had lied at trial out of fear but, as an adult, she had become motivated to admit the truth and seek forgiveness from applicant. Complainant

acknowledged that she had maintained her accusations against applicant as recently as a few months prior to the habeas hearing. Several months before her recantation, complainant and A.L.L. had visited the Robstown Police Department concerning an outcry of abuse made by another family member. During that meeting, complainant stated that applicant had molested her. Despite her recent statements adhering to her trial testimony that applicant sexually abused her, complainant maintained in her testimony that her recantation was true. She explained, "I said it because I'm so used to saying it, it's in my mind. . . . Even though it's not true, it's just in my mind, and I tried to remind myself not to say it."

Complainant testified that she was assaulted when she was younger, but it was by someone other than applicant. When asked, "Do you think, or do you recall somebody—anybody touching you in an inappropriate fashion when you were a little girl?" complainant responded, "Yes, I do." She testified that she was six or seven years old at the time. She recounted the lights were off during the incident and there was not enough light to identify the person but that she knew it was not applicant. When asked how she knew it was not applicant, complainant answered, "Because I know my dad. I love my dad. I would follow him everywhere." Despite stating there was not enough light to recognize the person's face, she testified that "it wasn't my dad because I know how my dad looks." Complainant then stated that the person was "one of my dad's friends." She stated that Johnny Molina had assaulted her but that she had accused applicant because "at that time . . . everybody wanted me to blame my dad."

The State traced the inconsistencies in the complainant's accounts, as follows:

[State]:  [T]he 2001 trial and when you said, "Everything you said was the truth, that your dad put his hands inside you," correct?

[Complainant]:  Yes, I said that.

[State]:  Okay.  And you said your dad's friends did not touch you, correct?

[Complainant]:  Yes, I said that.

[State]:  Okay.  In 2003, you had the second trial . . . and you testified there too where you testified that you told the truth to the hospital that you were touched by your dad?

[Complainant]:  Yes.

[State]:  Do you remember that?

[Complainant]:  Yes, I do.

[State]:  But your testimony today is that the hospital told you, you were touched by your dad?

[Complainant]:  Yes, and you can see it on the CPS [Child Protective Services]—the CPS recording that I had it's on there that I said that doctors told me.

[State]:  So you don't—so the doctors said, here's what I want you to say?

[Complainant]:  No, the doctors told me, [D.L.R.] had said that my dad touched [her] so they asked me, did your dad touch you?  I had said no.  Then I said I didn't remember.  Then they said, okay.  I just said, okay, my dad touched me so I could put my clothes back on.

* * *

[State]:  And then at trial, you told the jury that your so-called dad touched your privates with his hands and fingers in the shower and in the bed many times?

[Complainant]:  Yes.

[State]:            And that no one else touched your privates?

[Complainant]:      Yes, but I lied.

* * *

[State]:            And you also said that that made you feel like trash, that that made you feel like nobody?

[Complainant]:      Yeah.

[State]:            So you just made that up too?

[Complainant]:      I made it up.  Well, I still felt like trash because I was getting beat at home, but I felt like trash, yeah.

[State]:            And later on in that same trial, after your father was convicted and you moved on to the sentencing phase, you told the jury that he had messed up your life, and that even though a lot of people were saying that you were lying, that wasn't true?

[Complainant]:      Yes.

[State]:            That you were telling the truth and you thanked the jurors . . . for helping you . . . and your sisters . . . by convicting your father?

[Complainant]:      Yeah.

[State]:            But none of that was true either?

[Complainant]:      It's not true.

Complainant acknowledged the State's point that she had lied consistently to police, doctors, the hospital, the court, and jurors for almost twenty years, including as recently as a few months before her recantation, but she asserted that she was now telling the truth. She testified that she had lied consistently and knowingly to protect herself and her sisters from

A.M.T. and A.M.T.'s husband and also that she was pressured by Curiel, who felt that applicant needed to be in jail for touching D.L.R. and getting complainant's mother, Curiel's daughter, involved with drugs. Complainant also acknowledged that a few months prior to recanting, she had reconnected with applicant and some of his family. Copies of two letters sent by complainant to applicant were admitted as exhibits.[7] The first, DX-5, is from October 28, 2015. It reads,

> Hey dad sorry I have not wrote you. I have been really stressed with everything that is going on in life ..I'm sorry again don't think wrong I love you always I won't forget you .I wishyou were out here with me and my family and I have been praying for things to change .I'm hoping to go see you soon .please keep up with positive attitude I love you for that you seem so strong spiritually I hope to be like that one day .I love you dad always and forever .hope your doing ok. Let me know if u need to do anything for you .I don't know what to do to help you .I know I was scared when I was little but I know it was wrong for me to say things that weren't ture I hope you can forgive me for that .I'm sorry .I feel so bad but I was a little girl now I am an adult I need to fix it but don't know where to start. I love dad always and forever .pls write me back.

The second, DX-6, is from September 30, 2015. It reads,

> Hi dad. It's me [complainant]. Hope your doing ok. As for me I'm doing alright. I'm writing you to let you know that I love you always. I WILL never leave you again. I'm sorry it took me all these years to contact you. I know you tried your best as a parent I remember you always taking care of me and [A.L.L.] and [D.L.R]. Cooking cleaning and washing or clothes even if it was by hand. I love you for trying and for being a mom and dad. I wish things in our lives could be different it makes me so sad and angry how everything happened I know you weren't a bad person .when I saw you I remember lots of great memories that I miss as a family. I prey every night for you and that god keeps you mind positive. I want you to know I never forgot about you .you were always in my hear. I just didn't know how to come forward. I hope our

---

[7] Both letters are reproduced verbatim, including spelling and punctuation.

relationship can get better because you are my daddy always and forever .I read bones the letter you wrote me she was in tears .we love you always have and always will.  I'm so proud of you of how strong you are spiritually and mentally. I hope to hear from you soon I love you always your [complainant]. PS. I hope you got the picture.

Complainant denied that reconnecting with applicant or his family was the reason for recanting her allegations.  Instead, she testified that Curiel's death had freed her to finally recant because complainant had been afraid of hurting her grandmother or anyone in her mother's family.

### 3. A.A.P.'s Habeas Testimony

A.A.P. testified that she was neither sexually abused by applicant nor witnessed applicant sexually abuse any of her sisters.  She testified that she and her younger sisters, complainant, A.L.L., and D.L.R., were living with their eldest sister, A.M.T., and her husband in 2003 at the time of applicant's retrial.  A.A.P. testified that A.M.T. and her husband were physically and emotionally abusive and that they pressured complainant and A.L.L. to testify that applicant had assaulted them.  A.A.P. testified that her testimony at the punishment phase of applicant's trial, in which she thanked the jury for finding applicant guilty for what he had done to her sisters, was about her anger and resentment towards applicant for the lack of any parental support and the squalid and impoverished conditions in which they were raised due to his drug abuse.  However, notwithstanding her testimony during the punishment phase of applicant's trial, A.A.P. testified that, when sober, applicant was a good father and "the dad I wanted."  She stated that her current testimony was

completely voluntary and that she had not been coached.

A.A.P. also testified about the genesis of complainant's current recantation. A.A.P. testified that, around two years earlier, complainant had expressed to A.A.P. feeling as though complainant had been pressured into falsely accusing applicant and "needed to do something." On cross-examination, A.A.P. testified that, although A.M.T. and her husband pressured complainant to testify against applicant, A.A.P. could not recall if they told complainant what to say. A.A.P. testified that her grandmother, Curiel, disliked applicant and probably blamed him for her daughter's drug abuse.

### 4. A.L.L.'s Habeas Testimony

A.L.L. testified that she was unaware that she had been sexually assaulted until she was told that the examination indicated sexual assault, and even then she did not believe it to be possible. She testified that she recalled being interviewed by Child Protective Services but stated that she never accused applicant of sexually assaulting her. However, she testified that she did want to talk about other men who scared her but the interviewer continued focusing on applicant.

A.L.L. testified that she lived with her sister A.M.T. for a period of time leading up to applicant's trial. She testified that A.M.T. and her husband could be physically abusive and that they pressured A.L.L. to accuse applicant despite her belief that applicant had not sexually assaulted her. She also testified that her later allegations that applicant touched her made during a follow-up interview with Child Protective Services just prior to applicant's

trial were fabrications. A.L.L. testified that her testimony during the punishment phase of applicant's trial was based on anger because she had begun to believe that something must have happened to her sisters despite having no knowledge of what actually happened. A.L.L. testified that, shortly after applicant's trial, she produced an affidavit recanting her trial testimony. She explained,

> I told [applicant's] attorney that I had basically lied and that I was feeling really guilty even though I was young, I knew it was wrong, but I was very scared and I had a lot of reasons why I did lie and they weren't right. They're probably not good reasons to lie to most people. I had already been through a lot and I was just tired.

A.L.L. testified that she recalled testifying at applicant's motion-for-new-trial hearing that A.M.T. had not pressured her to accuse him but rather had told her to be honest. A.L.L testified that, although that was true, she believed she needed to continue falsely accusing applicant in order to avoid physical abuse from A.M.T. and her husband. When asked if she had actually been sexually assaulted by anyone, A.L.L. testified, "Yes, Sir. I've seen what they showed me in black and white [referring to the SANE reports]." But A.L.L. disavowed her earlier statements at applicant's punishment hearing in 2003 that applicant had assaulted her. The focus of her habeas testimony was that she accused applicant to maintain solidarity with the accusations of her sisters and to avoid physical abuse from A.M.T., but she had no memory of applicant abusing her.

### F. Habeas Court's Findings of Fact and Conclusions of Law

After the close of testimony, the habeas court recommended that this Court grant relief

to applicant on the basis that the complainant's recantation was new evidence that showed,

by clear and convincing evidence, that applicant was actually innocent. The habeas court

made the following findings of fact and conclusions of law:

**Findings of Fact**

1. [Complainant] indicated that [applicant] had touched her in 1997, 2001, 2003, and in early 2015.

2. [Complainant] did not make a public recantation until she went to the Robstown Police on November 15, 2015.

3. [Complainant's] testimony on December 12, 2016 was that she did not know who committed sexual assaults upon her, but that she was pressured by family members to blame [applicant]. She testified she only blamed [applicant] to end the embarrassment of the continuing examinations and investigations. She testified that she wasn't sure who had touched her because the lights were off. She stated she knew it wasn't her dad who touched her because she knows and loves her dad. At the trial in 2003 she testified that it was her "so called dad" who had touched her but now maintains that she lied about that.

4. [Complainant's] statement to child protective service advocates was contradictory and ambiguous. At times she denied her father's participation. At times she admitted it. At times she stated she didn't see who touched her. She stated that she was in fear concerning other men in the house. She said she heard her sister say her dad touched her.

5. [Complainant] testified during the trial of June, [2003], that [applicant] touched her. She also testified that in 2003 she had told the hospital the truth about being touched by her dad, but now claimed that it was the hospital who told her that her father had been the perpetrator.

6. [Complainant's] testimony that she was afraid of her sister and sister's husband was corroborated by the testimony of [A.L.L.] and [A.A.P.]. While there are some tangential matters on which this Honorable Court finds a lack of credibility on the part of [A.L.L.], it is clear the girls grew up in horrendous conditions with [applicant], had reason to hold grudges against him, and were subjected to physical abuse at the hands of [A.M.T. and her husband] before

and after the 2003 trial before they were removed from [A.M.T.'s] custody by Child Protective Services litigation later in 2003 and 2004. It was alleged that [complainant] and [A.L.L.] were coerced into testifying against [applicant] at the guilt-innocence or punishment phases regardless of whether such testimony would have been true or false.

7. [Complainant] told the doctors at the hospital that her father had sexually assaulted her and they found physical evidence that she had been sexually assaulted.

8. [Complainant] did not make any pre-trial recantation that the jury could have weighed when it found [applicant] guilty in 2003.

**Conclusions of Law**

1. [Applicant] brought this claim within the time allowed by law to bring a claim based on actual innocence.

2. The testimony of [complainant] recanting her testimony is "new evidence" for purposes of permitting a claim based on actual innocence.

3. A reasonable juror would not have found [applicant] guilty of the alleged offenses had it been presented with [complainant's] recantation of her outcry in 1997 and her trial testimony in 2003.

4. Though the timing of the recantation is suspect, the Applicant has proven by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence.

5. The Applicant has met his burden to prove entitlement to habeas relief as analyzed under the *Herrera* standard or its Texas progeny *Elizondo*, et al.

## II. Analysis

We disagree with the habeas court's determination that applicant has demonstrated

his actual innocence by clear and convincing evidence and is entitled to habeas relief on that

basis. We conclude that, under these circumstances, the complainant's recantation fails to

unquestionably establish applicant's innocence. We review the applicable law before applying that law to the facts of this case.

**A. Applicable Law**

"To establish that he is actually innocent of an offense of which he has been previously convicted, an individual seeking post-conviction relief on that basis must demonstrate by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *Ex parte Navarijo*, 433 S.W.3d 558, 560 (Tex. Crim. App. 2014); *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex. Crim. App. 1996). A claim that a witness's recantation unquestionably establishes innocence, as here, is properly understood as a freestanding claim of innocence. *Navarijo*, 433 S.W.3d at 567 n.2. When an applicant asserts a freestanding claim of innocence based on newly discovered evidence, the evidence presented must constitute affirmative evidence of his innocence, such as a trustworthy witness recantation. *Ex parte Franklin*, 72 S.W.3d 671, 678 n.7 (Tex. Crim. App. 2002). However, post-conviction recantations in sexual-assault cases "should not be accepted without close scrutiny nor, generally, without strong corroboration by independent evidence." *Ex parte Brown*, 205 S.W.3d 538, 549 (Tex. Crim. App. 2006). Evaluating whether an applicant has shown by clear and convincing evidence that no reasonable juror would have convicted him if presented with the newly discovered evidence requires examining the new evidence in light of the evidence presented at trial. *Navarijo*, 433 S.W.3d at 567. "[O]ur task is to assess the probable impact of the newly available evidence upon the persuasiveness of

the State's case as a whole, [and] we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial." *Id.* Accordingly, an applicant must make an "'exceedingly persuasive case that he is actually innocent'" before relief is warranted. *Id*. (quoting *Elizondo*, 947 S.W.2d at 206).

Although this Court is the ultimate fact-finder in resolving applications for post-conviction habeas relief, this Court ordinarily defers to the habeas court's factual findings, particularly those related to witness credibility and demeanor, when supported by the record. *Id*. We similarly defer to the habeas court's rulings on mixed questions of law and fact, if the resolution of those questions depends on an evaluation of credibility and demeanor. However, if the habeas court's findings and conclusions are not supported by the record, this Court may make contrary or alternative findings and conclusions. We review de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *Id*.

**B. Application of Law to the Facts**

We conclude that applicant has not carried his "Herculean" burden of demonstrating his actual innocence. We explain our determination by reviewing the findings of fact that fail to show whether the habeas court found the recantation to be credible, and the conclusions of law that are not supported by the record.

In the instant case, the habeas court's findings did not make express evaluations of credibility, and thus they are of limited value in this case. The habeas court's factual findings detail the testimony presented, but they fail to explain whether the habeas court determined

that the complainant's recantation was more credible than her trial testimony. Even assuming that the habeas court found the complainant's recantation to be more credible than her retrial testimony, we disagree that that finding would support the habeas court's recommendation to grant habeas relief on the basis of actual innocence under these circumstances, as we explain next.

We disagree with the habeas court's determination that the complainant had not recanted her allegations against applicant at any time prior to trial and that the jury was thus unaware of any such prior recantation. As noted above, the jury at applicant's retrial heard testimony from Teresa Garcia, the complainant, and Dr. Marshal Voris discussing the fact that the complainant had recanted her accusations before trial. Garcia testified that she attributed this to the trauma or discomfort of the situation. Voris testified that it was a result of improper questioning that reinforced that an accusation against applicant was being sought. The SANE report contained an annotation that, during the evaluation, complainant had accused applicant but then retracted that claim. Given this evidence that was heard at trial, the record does not support the habeas court's conclusion that the jury had not previously heard any recantation on complainant's part. What is "new" here is the resoluteness of complainant's recantation. Although the complainant's recent recantation is more adamant than her earlier recantation, it is not so much more compelling that it establishes by clear and convincing evidence that no reasonable juror would have found applicant guilty of sexually assaulting complainant.

We also disagree with the habeas court's conclusion that a "reasonable juror would not have found [applicant] guilty of the alleged offenses had it been presented with [complainant's] recantation of her outcry in 1997 and her trial testimony in 2003." The habeas court did not expressly make a finding that the complainant's recantation is credible, and the record is unpersuasive with respect to the veracity of the recantation. The habeas court notes in its third conclusion of law that "the timing of the recantation is suspect," and we agree with that observation. The complainant has inadequately explained why it took over a decade of time from the retrial until now for her to reveal the supposed pressure from her older sister that caused complainant to falsify her trial testimony against applicant. And the complainant's suggestion that she was coerced by her older sister to make false statements against applicant is inconsistent with the testimony of her other sister who denies being pressured in that way and with another sister who maintains that applicant was a sexual abuser. It appears that the habeas court may have determined that the lack of consistency in the complainant's testimony would likely have undermined her credibility at trial, but that is not the appropriate standard for an actual-innocence claim. Rather, the standard requires an applicant to make an "exceedingly persuasive case that he is actually innocent," which, here, would require him to provide evidence of a credible recantation supported by the record. *See Elizondo*, 947 S.W.2d at 206.

Even assuming that the habeas court's conclusion of law implies that it determined that the complainant's recantation was credible, that evidence is unpersuasive when it is

considered in the context of the totality of the record. The habeas court did not discuss the complainant's outcry or the medical findings in its conclusions of law favoring relief. The complainant claimed that she was pressured by her grandmother to say that applicant sexually assaulted her, but she waited until her grandmother had passed away to reveal that fact so now her grandmother cannot respond to those accusations. The medical reports show that the complainant was sexually abused, but the complainant does not provide any reasonable explanation with respect to who may have abused her if her claim that applicant is innocent is true. Complainant explains the medical evidence showing that she was sexually abused by stating that it was too dark to see who was sexually abusing her, yet she maintains that she knows it was not applicant. Complainant, therefore, is unable to identify anyone who is responsible for sexually abusing her. Complainant's current version of the events claiming abuse by an unknown person is not clear and convincing evidence of applicant's innocence, given that she has repeatedly identified applicant as the perpetrator over the course of twenty years off-and-on. We conclude that this post-conviction recantation in these sexual-assault cases lacks strong corroboration by independent evidence, and thus fails to establish that applicant is actually innocent. *See Brown*, 205 S.W.3d at 549.

By examining the new evidence in light of the evidence presented at trial, we determine that applicant has failed to show by clear and convincing evidence that no reasonable juror would have convicted him. *See Navarijo*, 433 S.W.3d at 567. Complainant's retrial testimony was specific and detailed, describing the frequency, location,

and mechanics of the abuse applicant committed against her. The SANE examination's findings offered independent corroboration of complainant's testimony, and her retrial testimony asserted that no one else had sexually abused her. In her punishment retrial testimony, complainant maintained applicant's guilt, and she did not seek to withdraw or change her retrial testimony at any point after the trial until almost two decades later. Moreover, she had persisted in her assertion of applicant's guilt long after she was removed from any coercive pressure from A.M.T. The timing of complainant's recent recantation is suspect, given that it was only a short period before her recantation that she reestablished contact with applicant and some of his family.

At best, complainant's recent recantation muddies the waters because it shows the inconsistency in her claims of sexual assault against applicant. We hold that applicant has failed to establish that he is actually innocent because he has not established by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. *See Navarijo*, 433 S.W.3d at 566-67; *Elizondo*, 947 S.W.2d at 209.

### III. Conclusion

Complainant's recantation fails to prove by clear and convincing evidence that applicant is actually innocent. We, therefore, deny relief.

Delivered: November 15, 2017

Do Not Publish